596 F.2d 1092
 5 Bankr.Ct.Dec. 109, Bankr. L. Rep. P 67,109
 In re TEXLON CORPORATION, Bankrupt.
William OTTE, as Trustee in Bankruptcy of Texlon
Corporation, Plaintiff- Appellee,
v.
MANUFACTURERS HANOVER COMMERCIAL CORPORATION, Defendant-Appellant.
 No. 669, Docket 78-5027.
 United States Court of Appeals,
Second Circuit.
 Argued March 6, 1979.
Decided April 20, 1979.
 
 Morton L. Gitter, New York City (Otterbourg, Steindler, Houston & Rosen, P. C., New York City), for plaintiff-appellee.
 Michael S. Landes, New York City (Hahn, Hessen, Margolis & Ryan, New York City, Gilbert Backenroth, New York City, of counsel), for defendant-appellant.
 Before FRIENDLY, SMITH and MANSFIELD, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This appeal from an order of the District Court for the Southern District of New York concerns a controversy between Manufacturers Hanover Commercial Corporation (MHCC) and the trustee in bankruptcy of Texlon Corporation (Texlon), formerly a debtor in possession in a Chapter XI proceeding, which began early in 1975. It concerns a practice, euphemistically called "cross-collateralization", which, we are told, has been authorized not infrequently by bankruptcy judges in the Southern District of New York. What this term means is that in return for making new loans to a debtor in possession under Chapter XI, a financing institution obtains a security interest on all assets of the debtor, both those existing at the date of the order and those created in the course of the Chapter XI proceeding, not only for the new loans, the propriety of which is not contested, but for existing indebtedness to it. We must determine whether the bankruptcy court properly authorized such "cross-collateralization" in this case, and, if not, whether the trustee's challenge came too late. We uphold Judge Brieant in answering both questions in the negative.
 
 I.
 
 2
 The facts can be briefly stated: On November 1, 1974, Texlon filed a petition for an arrangement under Chapter XI of the Bankruptcy Act. The bankruptcy judge signed on the same day Ex parte an order continuing the debtor in possession, other orders routinely entered at the commencement of such proceedings and the order giving rise to this litigation (hereafter referred to as the financing order). This authorized Texlon to enter into a number of agreements with MHCC for the factoring of accounts on a nonrecourse basis and for advances in connection therewith and, in MHCC's discretion, additional advances up to $100,000 to be evidenced by certificates of indebtedness issued pursuant to § 344 of the Bankruptcy Act. Texlon gave MHCC a security interest in all of its inventory and equipment and in the equity in the accounts, not merely for amounts paid under the factoring agreement and for certificates of indebtedness, but also for preexisting debt held by MHCC.[1] The application represented that any delay in authorizing these arrangements would be prejudicial to Texlon's continued viability, that only immediate approval would enable it to continue in business, and that the need for the relief was urgent and could not await a creditors' committee meeting. On November 6 MHCC began purchasing the accounts receivable. On the same day counsel for the debtor sent a copy of all the November 1 orders to the firm of Otterbourg, Steindler, Houston & Rosen, P. C. which had represented an informal creditors' committee prior to Texlon's decision to file under Chapter XI. A week later MHCC made a $40,000 advance against a certificate of indebtedness.
 
 
 3
 A creditors' committee meeting was held on November 19, on notice to the 100 largest creditors. The meeting elected an unofficial creditors' committee for which Mr. Otte, the present trustee, acted as secretary. Counsel for Texlon informed the creditors of the terms of the financing order. The committee retained the Otterbourg firm as counsel, and elected Mr. Otte as "stand-by" trustee. Thereafter MHCC advanced a further $60,000 against a certificate of indebtedness and factored new receivables. On December 10 the unofficial committee was elected as the official committee and was later authorized to retain the Otterbourg firm as counsel.
 
 
 4
 Texlon continued to suffer heavy losses. On January 10, 1975, it was adjudicated a bankrupt under § 376(2) of the Bankruptcy Act, and Mr. Otte was appointed Trustee. By this time MHCC had made factoring advances of $567,000 in addition to the loan of $100,000. Texlon's assets were sufficient to repay these and leave a surplus of $267,000,[2] which MHCC contends to be applicable to pre-petition indebtedness, variously stated as $660,000 or $695,000. According to appellee, allowance of MHCC's claims would denude the estate of substantially all its assets.
 
 
 5
 The Trustee moved on January 16, 1975 to modify the financing order "so as to provide that any equity in the collateral held by MHCC after satisfaction of the indebtedness due it under its Chapter XI factoring and other agreements, shall be applied for the benefit of all creditors pro rata, rather than in satisfaction of the unsecured portion of the pre-Chapter XI due MHCC from TEXLON." After proceedings unnecessary to detail and countless adjournments, Bankruptcy Judge Babitt denied the motion on November 11, 1977. He held that the financing order was "interdicted by the Act" and similar orders should not be entered in the future, both because the order gave pre-petition debt priority over that accorded post-petition Chapter XI creditors under § 64a(1), and also because it preferred the position of a pre-petition creditor over that of others in violation of § 70d(5). However, he declined to vacate the order because "(t)he elements of reliance on the order by MHCC, and the rights which vested because of such reliance, support this court's judgment that the order should be left in repose."
 
 
 6
 The trustee appealed to the district court. Agreeing with the bankruptcy judge that the "cross-collateralization" provision should not have been included in the financing order, although not clearly on the same grounds, Judge Brieant held that this was not the sort of case "where supervening equities attach in favor of a lender relying on a facially void order" since MHCC would be fully paid for all post-petition advances. Accordingly he reversed the order of the bankruptcy judge and directed that the Trustee's application be granted. On appeal MHCC argues that both the bankruptcy judge and the district judge were in error in holding that the Bankruptcy Act forbids "cross-collateralization" and that in any event the district judge erred by failing to recognize that the financing order had become final and non-appealable prior to the trustee's application.
 
 II.
 
 7
 We begin our discussion of the merits by agreeing with MHCC that the financing order did not run afoul of § 64a. Although, by virtue of § 302, § 64a applies in Chapter XI proceedings insofar as it is "not inconsistent with or in conflict with the provisions of" that Chapter, § 344 empowers the court to authorize a debtor in possession to issue:
 
 
 8
 certificates of indebtedness for cash, property, or other consideration approved by the court, upon such terms and conditions and with such security and priority in payment over existing obligations as in the particular case may be equitable.
 
 
 9
 It has long been the practice, both in equity receiverships and in reorganization proceedings under § 77, former § 77B, and Chapter X, for courts to authorize the issuance of certificates priming claims that would otherwise be entitled to prior payment.[3] Moreover the point at issue here is the creation not of a super-priority but of a secured interest, see 3A Collier, Supra, P 64.02(2). Compare White Chemical Co. v. Moradian, 417 F.2d 1015 (9 Cir. 1969). Indeed, it is common ground that, despite § 64a, the financing order is valid insofar as it created a new lien to secure the $100,000 of advances and any unpaid balance under the factoring agreement, even if enforcement of such a lien would deplete the funds from which priority claims could be paid.
 
 
 10
 We likewise agree with MHCC that, contrary to the views of the bankruptcy judge and the district judge, § 70d sheds no light on the problem here at issue.
 
 
 11
 The purpose of that subsection, enacted as part of the general revision of the Bankruptcy Act in 1938, was to protect certain transactions in the interval after the filing of an involuntary petition, which under §§ 1(4) and 1(13) initiates "bankruptcy", and "before adjudication or before a receiver takes possession of the property of the bankrupt, whichever first occurs." See 4B Collier, Supra, P 70.66(1); McLaughlin, Amendment of the Bankruptcy Act, 40 Harv.L.Rev. 583, 612-616 (1927), repeated by the author before Congress, Analysis of HR. 12889, 74th Cong. 2d Sess. 229-31 (1936), quoted in Bank of Marin v. England, 385 U.S. 99, 106-08, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966) (dissenting opinion of Mr. Justice Harlan). After the substantive provisions of § 70d(1), (2) and (3), § 70d(5) provides that:
 
 
 12
 Except as otherwise provided in this subdivision and in subdivision g of section 21 of this title, no transfer by or in behalf of the bankrupt after the date of bankruptcy shall be valid against the trustee.
 
 
 13
 The bankruptcy judge found this to be "clear, peremptory language" invalidating the "cross-collateralization" here attempted. We find it rather to be irrelevant. In the first place, since under § 302, the date of adjudication is taken to be the date of Texlon's petition, the "time gap" to which § 70d is addressed does not exist. See In re Yellow Cab Company of Philadelphia, 4 Bankr. Ct.Dec. 582, 585 (E.D.Pa.1978). Contrast Kass v. Doyle, 275 F.2d 258 (2 Cir. 1960) (applying § 70d to payment in interval between filing and approval of involuntary petition under Chapter X; pursuant to § 102, the Chapter X analog of § 302, the "date of adjudication" in a reorganization is taken to mean the date of Approval of the petition). Beyond this the bankruptcy judge's reading ignores the direction of § 342:
 
 
 14
 Where no receiver or trustee is appointed, the debtor shall continue in possession of his property and shall have all the title and exercise all the powers of a trustee appointed under this title, subject, however, at all times to the control of the court and to such limitations, restrictions, terms, and conditions as the court may from time to time prescribe.
 
 
 15
 Since by virtue of § 70a, the debtor in possession is thus "vested by operation of law with the title of the bankrupt as of the date of the filing of the petition," the creation of liens by the financing order was no more a "transfer by or on behalf of the bankrupt" within § 70d(5) than the creation of such liens by a trustee would have been. Finally, under § 70d(4) "(t)he provisions of paragraphs (1) and (2) of this subdivision shall not apply where a receiver or trustee appointed by a United States or State court is in possession of all or the greater portion of the non-exempt property of the bankrupt," and Bankruptcy Rule 11-2 defines the terms "receiver" and "trustee" to include a debtor in possession in the context of a Chapter XI arrangement.
 
 
 16
 The bankruptcy judge and the district judge were nevertheless correct in concluding that the Ex parte financing order was unauthorized insofar as it granted MHCC additional security for the pre-petition debt in consideration for its entering into the factoring agreement and making $100,000 in advances. Any such arrangement made by the bankrupt while insolvent and within four months before the filing of a petition would have constituted a voidable preference. See 3 Collier, Supra, P 60.19; In re Hygrade Envelope Corp., 393 F.2d 60, 63-64 (2 Cir.), Cert. denied 393 U.S. 837, 89 S.Ct. 114, 21 L.Ed.2d 108 (1968); Farmers Bank of Clinton v. Julian, 383 F.2d 314, 328 (8 Cir.), Cert. denied 389 U.S. 1021, 88 S.Ct. 593, 19 L.Ed.2d 662 (1967); In re Schindler, 223 F.Supp. 512 (E.D.Mo.1963). We have been pointed to no appellate decision in the long history of reorganization under § 77, former § 77B, Chapter X and Chapter XI of the Bankruptcy Act, that has sustained an order authorizing action by a receiver, trustee or a person with equivalent powers which, if done by the debtor, "would be a fraud on the act, as it would work an unequal distribution of the bankrupt's property." Tiffany v. Boatmen's Institution, 18 Wall. (85 U.S.) 375, 388, 21 L.Ed. 868 (1873). While § 357(6) permits a Chapter XI arrangement to contain "provisions for payment of debts incurred after the filing of the petition and during the pendency of the arrangement, in priority over the debts affected by such arrangement," nothing in that section suggests that different treatment for pre-petition debts of the same class is permissible. Yet the financing order allows MHCC, by entering into the factoring agreement and making fresh advances, to obtain security for its pre-petition debt commensurate with that of a post-petition debt.
 
 
 17
 MHCC argues that to forbid "cross-collateralization", more accurately a post-adjudication preference, in the absence of any express prohibition in the Bankruptcy Act would ignore the breadth of the language of § 344, as well as of § 2(a)(15) which empowers the bankruptcy court to:
 
 
 18
 Make such orders, issue such process, and enter such judgments, in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this title . . .,
 
 
 19
 and would run counter to the general policy of Chapter XI to promote rehabilitation. It claims these considerations to be supported by In re Applied Logic Corp., 576 F.2d 952, 959-60 (2 Cir. 1978), where we quoted with approval an extract from Judge Pope's dissent in First Nat'l Bank of Portland v. Dudley, 231 F.2d 396, 403-04 (9 Cir. 1956), and by § 364 of the Bankruptcy Reform Act of 1978.[4] We do not find these arguments persuasive. In Applied Logic we were dealing with a bank's statutory right of setoff under § 68a, a provision which by its very nature produces inequality, see 576 F.2d at 957. Judge Pope's statement was simply to the effect that a bank participating in a rescue effort should not lightly be found to have waived a right to preferred treatment derived from a specific provision of the Bankruptcy Act. And we expressly recognized that § 68a could not be utilized to effect a preference under § 60a, 576 F.2d at 962-63. To such limited extent as it is proper to consider the new Bankruptcy Act, which takes effect on October 1, 1979, in considering the validity of an order made in 1974, see Rohauer v. Killiam Shows, Inc., 551 F.2d 484, 494 (2 Cir.), Cert. denied 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977), we see nothing in § 364(c) or in other provisions of that section that advances the case in favor of "cross-collateralization."
 
 
 20
 In order to decide this case we are not obliged, however, to say that under no conceivable circumstances could "cross-collateralization" be authorized. Here it suffices to hold that, despite the absence from § 344 of the specific requirement of notice contained in § 116(2), see note 3 Supra, a financing scheme so contrary to the spirit of the Bankruptcy Act should not have been granted by an Ex parte order, where the bankruptcy court relies solely on representations by a debtor in possession that credit essential to the maintenance of operations is not otherwise obtainable. The debtor in possession is hardly neutral. Its interest is in its own survival, even at the expense of equal treatment of creditors, and close relations with a lending institution tend to prevent the exploration of other available courses in which a more objective receiver or trustee would engage. A hearing might determine that other sources of financing are available; that other creditors would like to share in the financing if similarly favorable terms are accorded them; or that the creditors do not want the business continued at the price of preferring a particular lender. We recognize that even so limited a holding means that, in cases originating under § 322 (or under § 321 where no creditors' committee had yet been appointed under § 44(b)), an order like the one here at issue perhaps could not be made until the first meeting of the creditors which, under § 334, shall be held "(n)ot less than twenty-five nor more than forty days after the petition is filed", or possibly even later, and that some possibly resuscitable debtors might sink in the interval. The risk of this, occurring only when the debtor has no unmortgaged assets adequate, in addition to those created by the advances, to induce existing creditors or new sources of financing to make them, is not too high a price to pay in order to protect the basic aim of the Bankruptcy Act to avoid inequality in the treatment of pre-petition debt. We note in this connection that under § 364 of the new Bankruptcy Act, to which MHCC has invited our attention, all orders authorizing a trustee to obtain unsecured or secured credit (except unsecured credit in the ordinary course of business allowable as an administrative expense) can be made only after notice and hearing. Although § 102(1)(B)(ii) construes this language as dispensing with "an actual hearing" if "there is insufficient time for a hearing to be commenced before such act must be done, and the court authorizes such act", such notice "as is appropriate in the particular circumstances" seemingly must be given in all cases where the Act requires notice and hearing.
 
 III.
 
 21
 MHCC contends that, however all this may be, the trustee's attack on the financing order came too late. Bankruptcy Rule 803 provides that:
 
 
 22
 Unless a notice of appeal is filed as prescribed by Rules 801 and 802, the judgment or order of the referee shall become final.
 
 
 23
 Rules 801 and 802 require that a notice of appeal be filed with the bankruptcy judge within 10 days of the date of the entry or judgment appealed from except that he may extend the time for not more than 20 days.[5] Since no such motion was made, MHCC contends that the financing order became final on November 11, 1974.
 
 
 24
 The trustee's application did not specify the procedural basis for his request to modify the financing order. We are now told that the legal authority was F.R.Civ.P. 60(b)(4),[6] which, along with the rest of F.R.Civ.P. 60, is made generally applicable in bankruptcy cases by Bankruptcy Rule 924.
 
 
 25
 The financing order was not "void" within the meaning of F.R.Civ.P. 60(b) (4). As has been said by one leading commentator, "(a) judgment is not void merely because it is erroneous. It is void only if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law." 11 Wright and Miller, Federal Practice and Procedure, § 2862 at 198 (1973) (footnotes omitted). Here § 311 of the Bankruptcy Act provided the bankruptcy court with exclusive jurisdiction over the debtor and its property, and the Act did not in terms require notice and hearing with respect to the financing order. Even if the order had been contrary to an express provision of the Bankruptcy Act, which we have held it was not, the order would not have exceeded the "jurisdiction" of the court. The case likewise does not fall within Professor Moore's formulation that a judgment may be "void" within F.R.Civ.P. 60(b)(4) even though the court "has the requisite jurisdiction over the parties or res" if its "action involves a plain usurpation of power." 7 Moore, Federal Practice P 60.25(2) at 303 (2d ed. 1978), See, e. g., In re Borek, 185 F.Supp. 567 (D.N.J.1960). The financing order was within the parameters of the bankruptcy court's authority, "(a)nd even gross error in the decree would not render it void." Swift & Co. v. United States, 276 U.S. 311, 330, 48 S.Ct. 311, 316, 72 L.Ed. 587 (1928). See Independence Mtg. Trust v. White, 446 F.Supp. 120, 123-24 (D.Or.1978).
 
 
 26
 The trustee can likewise find little solace in F.R.Civ.P. 60(b)(1), which permits relief to be granted with respect to a judgment or order in cases of "mistake". Relying on the omission of the word "his" in the 1946 revision of that rule, Professor Moore had argued that the rule encompasses judicial error, 7 Moore, Federal Practice P 60.22(3). We adopted that view in Tarkington v. United States Lines Co., 222 F.2d 358 (2d Cir., 1955), but only in what we later characterized, see Schildhaus v. Moe, 335 F.2d 529, 531 (2d Cir., 1964), as "very special facts", to wit, a controlling Supreme Court decision handed down eleven days after the entry of judgment and a motion made ten days thereafter, within the 30 days allowed for appeal. The 1978 edition of the Moore treatise reflects some disenchantment with the practice of utilizing F.R.Civ.P. 60(b)(1) as a vehicle for the correction of judicial error, and the other leading treatise on federal practice displays still less enthusiasm, see 11 Wright & Miller, Supra, § 2858.[7] Even according to Professor Moore's view, the motion here would have been untimely with respect to a contested civil action since the "reasonable time" requirement of F.R.Civ.P. 60(b) would be read as requiring a motion for relief from judicial mistake to be made within the time allowed for appeal. See 7 Moore, Supra, at 268; cf. 11 Wright & Miller, Supra, at 178. The treatises understandably do not discuss whether such a limiting principle should apply to an Ex parte order in bankruptcy.[8]
 
 
 27
 However, the trustee is entitled to prevail upon another ground. In Wayne United Gas Co. v. Owens-Illinois Glass Co., 300 U.S. 131, 137-38, 57 S.Ct. 382, 386, 81 L.Ed. 557 (1937), the Supreme Court held that a district court sitting in bankruptcy could in its discretion rehear a cause even after the expiration of the period allowed for appeal "if no intervening rights will be prejudiced by its action" and that if the court rehears the petition "upon the merits", the time to appeal would run from its grant or denial. Pfister v. Northern Illinois Finance Corp., 317 U.S. 144, 63 S.Ct. 133, 87 L.Ed. 146 (1942), applied the same rule to orders of a conciliation commissioner under § 75 of the Bankruptcy Act, the functional equivalent of the bankruptcy judge here.
 
 
 28
 We cannot believe that Bankruptcy Rule 803 or Rule 924 making F.R.Civ.P. 60 generally applicable in bankruptcy proceedings intended to diminish the force of these two well-known decisions.[9] Indeed, without discussion, we have assumed the contrary, SEC v. F. O. Baroff Company, Inc., 497 F.2d 280, 282 n. 3 (2 Cir. 1974). As said in 7 Moore, Federal Practice, P 60.18 at 215:
 
 
 29
 The bankruptcy principles previously stated (to wit, Wayne and Pfister ) may be distinguished from those obtaining in federal civil actions because of the distinctive nature of bankruptcy proceedings. A bankruptcy proceeding is one continuous, often long, proceeding, within which many other controversies and proceedings occur during the course of administration. There is practical utility in the application of a rule which permits the vacation or modification of bankruptcy orders where subsequent events presented during administration demonstrate the necessity therefor; and to do so would not be inequitable. Nor does the relatively unlimited power thus invoked raise any unanswerable objections of hardship or uncertainty when it is applied pursuant to well established bankruptcy principles. (Footnotes omitted.)
 
 
 30
 The Pfister case arose in the bankruptcy court after General Order 37 but the opinion made no mention of F.R.Civ.P. 60(b). Some argument against this may be made on the basis of the statement in the Advisory Committee's Note to Rule 924:
 
 
 31
 These rules do not preserve the features of the practice pertaining to so-called "administrative orders," which have been regarded as subject at any time to reconsideration by the referee or to review by the district court without regard to the limitations of § 39c of the Act. See, E. g., Flaxman, Coleman, Gorman & Rosoff v. Cheek, 355 F.2d 672, 674 (9 Cir.), Cert. denied 384 U.S. 954, 86 S.Ct. 1574, 16 L.Ed.2d 549 (1966); Fazakerly v. E. Kahn's Sons Co., 75 F.2d 110 (5 Cir. 1935); 2 Collier, P 39.18 (1968).
 
 
 32
 However, neither this Note nor the Note to Rule 803 referred to Wayne and Pfister.
 
 
 33
 If Wayne and Pfister have survived, as MHCC seemingly concedes, we have no difficulty in finding that the trustee's application was encompassed by them. Although the bankruptcy judge characterized his opinion as merely "advisory", it is clear that he reconsidered the financing order, concluded he had erred in signing it, but thought he was precluded from amending it. This is all that is needed to constitute "reexamination", See Pfister, supra, 317 U.S. at 149-150, 63 S.Ct. 133; Kleins Outlet, Inc. v. Lipton, 181 F.2d 713, 714 (2d Cir. 1950), Cert. denied, 340 U.S. 833, 71 S.Ct. 59, 95 L.Ed. 612 (1951); SEC v. F. O. Baroff Company, Inc., supra, 497 F.2d at 282 n. 3. The trustee's application also fulfilled the requirement stated in Wayne, supra, 300 U.S. at 137, 57 S.Ct. at 385, that it be made "before rights have vested on the faith of (the) action" and that "no intervening rights will be prejudiced by its action." MHCC has not suffered any actual loss from reliance on the financing order as the factored accounts more than sufficed to reimburse MHCC for the Chapter XI advances against them as well as for all interest charges, factoring commissions and other expenses. Additionally there are ample funds to repay the $100,000 certificates of indebtedness.
 
 
 34
 While it may be that MHCC would not have engaged in these transactions but for its hope of securing a preferred position for the pre-petition debt, this is not the kind of prejudice that bars reconsideration. The test is whether, upon granting the motion to reconsider, the court will be able to reestablish the rights of the opposing party as they stood when the original judgment was rendered, see, E. g., Wharton v. Farmers & Merchants Bank of Green Ridge, 119 F.2d 487, 489 (8 Cir. 1941); In re Technical Marine Maintenance Co., 169 F.2d 548, 553 (3 Cir. 1948). Almost by definition it cannot be necessary for reconsideration that the court should be able to place a losing party in the same position as if there had been none.
 
 
 35
 The order of the district court is affirmed.
 
 
 
 [1]
 Prior to November 1, 1974, MHCC, in addition to factoring Texlon's accounts, had lent Texlon $1,000,000 for the purchase of equipment, of which a large balance remained unpaid. MHCC had received, as security for this loan, a lien on Texlon's machinery, fixtures, and equipment. The financing order provided that the Chapter XI collateral (the inventory and the equity in new accounts receivable) would stand as additional security for MHCC's outstanding indebtedness, and further provided that Texlon could continue to make payments to MHCC on account of its pre-Chapter XI equipment loan in the same amounts as before
 
 
 [2]
 This represents $235,000 surplus held by MHCC from the purchase of accounts during the Chapter XI proceeding and $32,000 held by the trustee arising from the sale of inventory
 
 
 [3]
 The power of an equity court which had appointed receivers of a railroad to issue such certificates to procure funds for the preservation and operation of the property was said to be beyond debate a century ago, see Wallace v. Loomis, 97 U.S. 146, 162-63, 24 L.Ed. 895 (1877), although the Court admonished that this was "a power to be exercised with great caution; and, if possible, with the consent or acquiescence of the parties interested in the fund." This was true also with respect to receivers of other public service corporations. In other cases, the issuance of receivers' certificates priming other claims was limited to the incurring of debt needed for the "preservation" as distinguished from continued operation of the property, at least in situations where the certificates were to take priority over existing liens. See 2 Clark, Law of Receivers, § 466 at 766-67 (3d ed. 1959); Payne, The General Administration of Equity Receiverships of Corporations, 31 Yale L.J. 685, 696-97 (1922); Tondel and Scott, Trustee Certificates in Reorganization Proceedings Under the Bankruptcy Act, 27 Bus.Law. 21, 31-32 (1971). When the Bankruptcy Act was amended to provide for reorganization of railroads in 1933, § 77(c)(3) gave the court broad authority to allow the trustee to issue such certificates. Section 77B(c)(3), relating to most other business corporations, enacted in 1934, provided that the court:
 (3) may, for cause shown, authorize the debtor or the trustee or trustees, if appointed, to issue certificates for cash, property, or other consideration approved by the judge for such lawful purposes, and upon such terms and conditions and with such security and such priority in payments over existing obligations, secured or unsecured, as may be lawful in the particular case; . . .
 This enlarged the power to authorize trustees of non-public service corporations and of debtors in possession to issue certificates. See Johnson, Bankruptcy Reorganization, §§ 421, 423 (1936). Under the Chandler Act of 1938, § 77B(c)(3) was translated into § 166(2) in Chapter X and § 344 in Chapter XI. The sections differ in two respects. Whereas § 116(2) requires "such notice as the judge may prescribe," § 344 omits this phrase. Although § 116(2) expressly states that Chapter X certificates may take priority over existing obligations "secured or unsecured", § 344 omits the quoted phrase. Nothing in this opinion is to be taken as expressing a view on whether certificates issued under § 344 can be given a lien over other Secured obligations, see 8 Collier, Bankruptcy P 6.40(7.2) (1978). The instruments here at issue did not purport to do this.
 
 
 [4]
 This reads as follows:
 (a) If the trustee is authorized to operate the business of the debtor under section 721, 1108, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.
 (b) The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.
 (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt
 (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
 (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
 (3) secured by a junior lien on property of the estate that is subject to a lien.
 (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if
 (A) the trustee is unable to obtain such credit otherwise; and
 (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
 (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.
 (e) The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.
 (f) Except with respect to an entity that is an underwriter as defined in section 1145(b) of this title, section 5 of the Securities Act of 1933 (15 U.S.C. 77e), the Trust Indenture Act of 1939 (15 U.S.C. 77aaa et seq.), and any State or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security does not apply to the offer or sale under this section of a security that is not an equity security.
 Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2574.
 
 
 [5]
 A motion for such an extension must be made within the 10 day period "except that a request made after the expiration of such time may be granted upon a showing of excusable neglect if the judgment or order does not authorize the sale of any property."
 
 
 [6]
 This authorizes a court to relieve a party from a final judgment or order when "(4) the judgment is void."
 
 
 [7]
 The authors characterize, p. 178, as the "easiest group of cases" for denial of a 60(b)(1) motion to correct judicial error as "those in which the error involved a fundamental misconception of law and the motion was not made until after the time for appeal had run" the situation presented here
 
 
 [8]
 The trustee was in no position to appeal within ten days of the order since he was not appointed until January 10, 1975; however, he did move within six days thereafter. MHCC contends that a timely appeal could have been taken by the informal creditors' committee whose counsel learned of the financing order early in November 1974 or, on appropriate motion under Rule 802(c), by the unofficial creditors' committee elected on November 19
 
 
 [9]
 F.R.Civ.P. 81(a)(1) provided that the Rules of Civil Procedure "do not apply to proceedings in bankruptcy . . . except in so far as they may be made applicable thereto by rules promulgated by the Supreme Court of the United States." General Order in Bankruptcy 37, promulgated 305 U.S. 677, 698 (1939), effective February 13, 1939, made the Rules applicable when not inconsistent with the Bankruptcy Act or the General Orders. This was abrogated effective October 1, 1973, by the order promulgating the Bankruptcy Rules, see 1 Collier, Supra, P 2.81. In a few instances, such as Rule 924, the Bankruptcy Rules adopt certain Rules of Civil Procedure; in others "they adapt the Federal Rules to the distinctiveness of bankruptcy cases." 7 Moore, Federal Practice, Part 2, P 81.04(1) at 81-56