**In re ROBLIN INDUSTRIES, INC., Debtor.**

**Bankruptcy No. 85–11161 C.**

United States Bankruptcy Court, W.D. New York.

Aug. 13, 1985.

---

Eugene Smolka, William Shapiro, James J. Tanous, Janet Burhyte, Jaeckle, Fleishmann & Mugel, Buffalo, N.Y., for debtor.

Robert M. Spaulding, John J. Hurley, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y., for Marine Midland Bank.

David C. Horan, Albrecht, Maguire, Heffern & Gregg, Buffalo, N.Y., for Chemical Bank.

John J. Preefer, Wofsey, Certilman, Haft, Lebow & Balin, New York City, for U.S. Trust Co.

Ralph L. Halpern, Raichle, Banning, Weiss & Halpern, Buffalo, N.Y., for Brent Baird.

Jane B. Wolfe, U.S. Atty's Office, Buffalo, N.Y., for the U.S. Dept. of Commerce and the I.R.S.

Carl L. Bucki, Moot & Sprague, Buffalo, N.Y., for Envirogas, Inc.

Lawrence Feldman, New York City, for N.Y. Job Development Authority.

Michael L. Fayette, Kleiner & Fayette, Grand Rapids, Mich., for UAW Pension Fund.

Robert J. Feldman, William E. Storrs, Gross, Shuman, Silver, Laub & Gilfillan, Buffalo, N.Y., for CBT.

James Marvin, Damon & Morey, Buffalo, N.Y., for Bank of New York.

Gabriel Ferber, Davis, Nesper & McElvein, Buffalo, N.Y., for Austrian Bank.

Henry W. Cornell III, Mahoney, Berg & Cornell, Buffalo, N.Y., for Chase Manhattan Bank.

Michael Riley, for the U.S. Workers of America.

JOHN W. CREAHAN, Bankruptcy Judge.

On July 1, 1985, Roblin Industries, Inc., filed its petition for relief under Chapter 11 of the Bankruptcy Code. 11 U.S.C. Chapter 11. At the same time, applications were filed and orders entered with respect to several matters, mostly of a routine nature. Among these were orders approving the employment of attorneys and accountants and the payment of pre-petition wages to some four hundred employees. Also filed at that time was a motion for court approval of a stipulation entered into between the debtor and Marine Midland Bank, N.A., and Chemical Bank (Banks). The stipulation sets forth the terms and conditions under which the Banks will loan the debtor up to twelve million dollars ($12,000,000) during the reorganization proceedings.

Roblin Industries, Inc., is engaged in the production of specialty steel and related products. At the time it filed its Chapter 11 petition it was without funds to pay salaries and wages, to purchase inventory, and to cover other daily operating expenses. Papers in support of the motion for an interim financing order demonstrate Roblin's pressing need for immediate borrowing to obviate a disruption of its manufacturing operations. Counsel for the debtor submitted a proposed financing order in connection with its motion. After a hearing conducted on shortened telephone notice to the debtor's twenty largest creditors, an order was entered on July 2, 1985, authorizing the requested financing on an interim basis. The order provided that a further hearing would be conducted on August 6, 1985, on notice to all creditors and other parties in interest. It provided further that certain provisions of the stipulation would not be effective should the Court not continue the order following the final hearing on August 6, 1985. The order authorized the debtor to borrow from the Banks up to a maximum of $12,000,000 secured by a lien on all of the debtor's pre-petition and post-petition property subject to certain enumerated security interests which were acknowledged to be senior. Provisions also were made for super-priority status under section 364(c) of the Code [11 U.S.C. § 364(c)] and for cross-collateralization of pre-petition indebtedness.

For some years pre-petition Roblin has financed its operations not only with Marine and Chemical but also with Chase Manhattan Bank, N.A. Pursuant to that joint financing conducted under a series of agreements, the debtor's obligations as of June 24, 1985, amounted to $23,724,224.50. Under one of the agreements, the debtor had incurred debt of $7,371,912 for revolving credit. These obligations were secured by liens on all of the debtor's real and personal property, subject to certain senior interests mentioned in the order. Chase is not participating in the post-petition financing.

On August 6, 1985, the Court conducted the final hearing mandated by the order of July 2, 1985. Objections to the existence and continuation of the order of July 2, 1985, and to the stipulation dated July 1, 1985, were served and filed by United States Trust Company of New York (U.S. Trust). U.S. Trust is the indenture trustee of subordinated debentures held by approximately 400 persons. The objections were vigorously supported by counsel representing other unsecured creditors who appeared and actively participated in the hearing.

Specific objections are addressed to certain provisions of not only the order but also the stipulation. To the extent that the

order approves the stipulation, its provisions are certainly relevant. To the extent that the objectionable provisions of the stipulation are not authorized by the Bankruptcy Code or by the Court, they do not bind the debtor's estate. *Compare* 11 U.S.C. § 549. (The section deals with transfers, not transactions in general.) The Court's duty here is not to dictate the terms of post-petition financing arrangements between the debtor and its lenders, but to deny its blessing of any transactions that are not appropriate.

## WAIVER OF RIGHTS

■ Most repugnant to the objecting parties is provision numbered "2" of the stipulation which they characterize as a settlement of any and all controversies that may exist by virtue of pre-petition transactions between the debtor and its lenders, the Banks. Provision 2 states:

2. The Pre-Petition obligations are properly accelerated and demanded, the debtor waives any notice in connection therewith, and all such obligations are now due and payable and are not subject to any offset, claim, counterclaim or defense.

The Court is satisfied that the objection is well founded. While provision 2 is not effective under the terms of the July 2, 1985, interim financing order, it will become effective if the Court continues that order. The Banks argue that no sane financier will lend into a lawsuit and that such terms are common and are a part of the existing loan agreement. The Court cannot argue with the Banks' logic.

The commencement of the Chapter 11 case, however, in providing the debtor with an opportunity for financial relief, has also interdicted the rights of all those who have dealt with it in the past. We no longer have only the interests of the parties to a pre-petition credit agreement to consider. We now have a new entity "armed cap-a-pie with every right and power which is conferred by the law of the state upon its most favored creditor." *In re Waynesboro Motor Co.*, 60 F.2d 668, 669 (S.D.Miss.

1932); cited in 4 Collier on Bankruptcy, ¶ 544.02 at 544-4, 544-5 (15th ed. 1985). See also, 11 U.S.C. § 1106. There are new intervening rights also provided for in the Code which are part of the quid pro quo. These legislatively created rights, available to a trustee or Code debtor, are intended to benefit all creditors. While U.S. Trust argues that approval of the stipulation would read section 510 out of Title 11, in the Court's view it would render useless any of the debtor's powers of avoidance. Furthermore, in the Court's view, if authorized it would bind any trustee who was appointed in the case.

■ As argued by counsel for U.S. Trust, the provision is in the nature of a settlement, which can only be approved on a proper showing. *In re Lion Capital Group*, 49 B.R. 163, 175 (Bankr.S.D.N.Y. 1985). Additionally, a debtor in possession, like a trustee, is a fiduciary of each creditor of the estate. As such, it must exercise that measure of care that an ordinarily prudent person would exercise under similar circumstances. *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1357 (9th Cir. 1983); *Wolf v. Weinstein*, 372 U.S. 633, 650, 83 S.Ct. 969, 979, 10 L.Ed.2d 33, 47 (1963); *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 461 (6th Cir.1982). A blanket waiver of unspecified rights in the early stages of a complex corporate reorganization would not appear to manifest prudent judgment.

■ Also objectionable to U.S. Trust is that provision which stipulates that "[t]he Banks hold a valid, duly perfected security interest in the Pre-Petition Collateral to secure the payment of the Pre-Petition Obligations." (Provision numbered "1".) Such a finding, whether by virtue of the stipulation or by reference to the multitude of voluminous documents submitted at the hearing, would be in the same nature as the waiver of defenses. To the extent that this is the purpose of the provision, it is inappropriate at this point without an opportunity for more comprehensive scrutiny by interested parties. It would be improper for the Court to make such a finding in

the face of creditor objections. To adjudicate the validity, priority, or extent of a lien requires the commencement of an adversary proceeding. Rule 7001, Rules of Bankruptcy Procedure. On the basis of these two objections alone, the Court cannot give final approval to the stipulation.

## CROSS–COLLATERALIZATION

■ Further provisions of the stipulation and/or order that U.S. Trust finds objectionable are those relating to cross-collateralization, the super-priority provided for in section 364(c), and the adequacy of the Banks' pre-petition collateral. U.S. Trust argues that before authorizing cross-collateralization, the Court must find inter alia that the proposed financing is in the best interest of creditors generally. In support, the creditor cites *In re Texlon Corp.*, 596 F.2d 1092 (2d Cir.1979) and *In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr.E.D.N.Y.1983). At first blush, *Texlon* appears to stand for a more limited proposition. As the court states at 1098:

> In order to decide this case we are not obliged, however, to say that under no conceivable circumstances could "cross-collateralization" be authorized. Here it suffices to hold that, despite the absence from § 344 of the specific requirement of notice contained in § 116(2), see note 3 *supra*, a financing scheme so contrary to the spirit of the Bankruptcy Act should not have been granted by an *ex parte* order, where the bankruptcy court relies solely on representations by a debtor in possession that credit essential to the maintenance of operations is not otherwise obtainable.

The opinion goes on to state that a hearing may determine that other sources of financing are available, that other creditors might wish to share in the financing on similarly favorable terms, or that creditors would rather the case not continue at the price of preferring a particular lender. In *Vanguard*, Judge Parente extracts from *Texlon* and other sources some considerations useful in addressing the cross-collateralization issue. Judge Parente's sugges-

tions make good sense. He suggests that if the debtor wishes to engage in this disfavored means of financing, it must demonstrate that:

> (1) Absent the proposed financing, its business operations will not survive, see Weintraub & Resnick, *supra* at 90–91;
> (2) It is unable to obtain alternative financing on acceptable terms, Weintraub & Resnick, *supra* at 90, see *In re Texlon, supra* at 1098;
> (3) The proposed lender will not accede to less preferential terms; and
> (4) The proposed financing is in the best interests of the general creditor body, see *In re Texlon Corp., supra* at 1098–99.

*Vanguard* at 366.

With respect to the first element, Mr. Roncalato, the debtor's vice-president and chief financial officer, testified that, absent the interim borrowing authorized by the July 2, 1985, order, the debtor would have to suspend operations. It was further evident from Mr. Roncalato's testimony and from papers filed in connection with the present motion that the debtor has for several years financed its daily operations in substantially the same manner now in effect under the interim order. While able to continue in business, it has not been able to meet all its obligations. Despite this ongoing financing, the debtor is in default for several years past of payments due under a pension plan arrangement for the benefit of some former employees. The Court is satisfied that, absent the proposed financing, the debtor will be unable to purchase inventory, meet its payroll, maintain its property, and continue in operation.

As to whether the debtor is able to obtain alternative financing, the state of the evidence is less than satisfactory. Over objection by counsel, the Court permitted hearsay testimony with respect to efforts by the debtor's principal to obtain alternative financing. In effect, the debtor was denied the opportunity to offer admissible evidence. However, the Court addresses the cross-collateralization objection, not because it is necessary to its decision, but

because the parties are entitled to be apprised of the Court's viewpoint in the event they should hereafter modify the terms of their agreement. For present purposes, the Court is satisfied that admissible evidence is available to support this element should it be necessary in the future. It should be noted that no eager financier has rushed to succor the debtor, one of the prospects opined in *Texlon*, 596 F.2d at 1098.

Dennis Dombek, an officer of Chemical Bank, testified that he was involved in negotiating the terms of the financing in question. While he was not asked his reasons, he made the unadorned statement that the Banks were not willing to lend on any terms other than those proposed. Mr. Roncalato exhibited a sound knowledge of the debtor's financial condition. His inability to wax eloquent concerning "equitable subordination" and "domination and control" upon cross-examination has little bearing on his expertise in his own field. The Court is satisfied that he negotiated the best terms he could under the circumstances.

With respect to the final element of Judge Parente's test, that the financing be in the best interest of creditors, the Court has never been sure that creditors ever have all the information necessary to determine with certainty where their best interest lies. The general consensus to be drawn from the arguments of the several creditors' counsel present and supporting the objections of U.S. Trust is, as to be expected at this point, in support of the lending. It is the terms they object to. They seem to feel that the present arrangement will be continued on terms more favorable to the debtor and to themselves. Whether that assumption is warranted or not remains to be seen. The Court can only approve or disapprove the proposed arrangement. It cannot require the Banks to put additional funds at risk against their better judgment.

The Banks and debtor "believe" the prepetition obligations are oversecured. U.S. Trust claims that in reality they are undersecured. If in fact they are undersecured, absent financing the debtor would in all likelihood shut down, liquidation would follow, and unsecured creditors would receive no distribution from the debtor's estate. As pointed out in the objections filed by U.S. Trust, the debtor is engaged in an industry convulsed by rising costs and declining markets. The liquidation value of a moribund steel plant is highly speculative. Western New York already has several such facilities. Bethlehem Steel's Lackawanna plant alone had at one time 21,000 employees. With the exception of two mills employing 1,500 people, the plant has remained idle for some years with no viable prospect for sale or reopening. Roblin's reorganization or its sale as a going concern is speculative at this point. An ongoing operation which maintains the value of plant and equipment at a level in excess of liquidation is in the best interest not only of the Banks but of all creditors. The provisions for cross-collateralization to permit that operation are not contrary to the spirit or intent of the Code.

## SUPER–PRIORITY

The financing order provides that as part of their loan package the Banks shall be given a priority expense over any and all other expenses of the debtor that are provided for in sections 503(b) or 507(b) of the Code. 11 U.S.C. §§ 503(b), 507(b). This "super-priority" is provided for in section 364(c)(1) of the Code. However, creditors argue that to grant such a priority in effect would deny the creditors committee the ability to retain quality professionals to carry forward an energetic review of the debtor's affairs because of the uncertainty of reimbursement from the debtor's estate. This very argument failed to impress the United States Court of Appeals for the Second Circuit in *In re Flagstaff Foodservice Corporation*, 739 F.2d 73 (2d Cir. 1984). The bankruptcy court in *Flagstaff* had awarded to professionals who had served in the case interim compensation from post-petition assets subject to a lender's lien provided for in a financing order

similar to that proposed here. The order also provided for the section 364(c)(1) super-priority. In reversing the award of compensation, the court recognized the problem which is raised here. It recognized the interplay between sections 364(c)(1), 503(b), 507(b), and 330, and stated:

> Looking to the plain language of these sections, as we are bound to do, *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917), we conclude that GECC's security interest has priority over appellees' claims for professional services, *In re Malaspina*, 30 B.R. 267, 270 (Bkrtcy.W.D.Pa.1983); 3 *Collier on Bankruptcy* ¶ 507.05, at 507–44 (15th ed. 1984). To the extent that *In re Callister*, 15 B.R. 521 (Bkrtcy.D.Utah 1981), *appeal dismissed*, 673 F.2d 305 (10th Cir.1982), relied upon by appellees, is to the contrary, we decline to follow it. Where, as here, the statutory language clearly expresses the congressional intent, a court may not read another meaning into the statute in order to arrive at a result which the court deems preferable. *Central Trust Co. v. Official Creditors' Committee of Geiger Enterprises, Inc.*, 454 U.S. 354, 359–60, 102 S.Ct. 695, 697–98, 70 L.Ed.2d 542 (1982); *In re Fidelity Mortgage Investors*, 690 F.2d 35, 39–40 (2d Cir.1982). Attorneys may, as Levin & Weintraub did here, secure a portion of their fee in advance. *See Matter of Arlan's Dep't. Stores, Inc.*, 615 F.2d 925, 935–37 (2d Cir.1979). If attorneys need more encouragement than this to participate in chapter 11 proceedings, *Congress, not the courts, must provide it.* Under the law as it presently exists, knowledgeable bankruptcy attorneys must be aware that the priority ordinarily given to administration expenses may "prove illusive in light of the various provisions in the Code for competing or super-priorities." 2 *Collier on Bankruptcy* ¶ 364.02, at 364–6 (15th ed.1984). Section 364(c)(1) is such a provision. *Emphasis supplied.*

*Id.* at 75. Because counsel here comprehend the scenario in advance is no reason to deny to a proposed lender those safeguards provided by the legislature.

Indeed, in *Flagstaff* the court appears more concerned with the chilling effect a denial of those safeguards might have on potential reorganization financiers.

> Saddling unconsenting secured creditors with professional fees, such as are sought by appellees, would discourage those creditors from supporting debtors' reorganization efforts.... The Financing Order granting GECC a super-priority position was intended to give GECC protection against the very awards made herein. The lack of sufficient unencumbered assets to pay appellees' fees is not an adequate basis for denying GECC its super-priority status. *See Seaboard Nat. Bank v. Rogers Milk Products Co.*, *supra*, 21 F.2d [414] at 417 [1927]. Although it has been well said that "professionals should not be expected to finance the administration of liquidation or reorganization cases," 2 *Collier on Bankruptcy* ¶ 331.01, at 331–3 (15th ed. 1984), "it does not follow that in the event the estate has no unencumbered funds from which to pay such expenses, the secured creditor becomes obligated to satisfy these obligations." *In re S & S Indus., Inc.*, *supra*, 30 B.R. [395] at 399 [1983].

*Flagstaff*, *supra*, 739 F.2d at 77.

More recently the Circuit has reiterated those concerns in another decision involving the same debtor. *See*, *In re Flagstaff Foodservice Corporation*, 762 F.2d 10, 13 (2d Cir.1985).

### LIEN UNDER SECTION 363(e)

The objection to the super-priority, to the value of the debtor's pre-petition collateral, and to that provision of the order granting the Banks a lien on post-petition assets pursuant to section 363(e) as adequate protection for the debtor's use of certain pre-petition collateral, are all inextricably bound up with the issue of cross-collateralization. Also involved are those aforementioned substantive provisions of the Code. [11 U.S.C. §§ 503(b), 507(b), 364(c), 330]. Although provided by Congress, they reflect competing considerations. Because

they sometimes collide, it does not follow that they are offensive.

Specific provisions of the Code provide for each facet of the cross-collateralization issue. Post-petition advances may be secured not only by post-petition assets but by pre-petition assets as well as by a super-priority grant against otherwise unencumbered assets. 11 U.S.C. § 364(c)(1), (2), (3). Secured parties can be given a security position on post-petition assets as adequate protection for the use of collateral which secures pre-petition obligations. 11 U.S.C. §§ 361, 363(e). The harm to be perceived arises from the concern that the reorganization opportunity provided by the Code is not intended solely for the benefit of pre-petition secured lenders but for all creditors. If the effort is successful and a plan of reorganization is confirmed, no harm should result. If it fails, the result to be avoided is an improvement in the Banks' position such as was evident in *Texlon.* 596 F.2d at 1095. There liquidation of the post-petition assets fully satisfied the post-petition secured obligations and yielded an excess. The lender sought to have the excess applied to its pre-petition obligation. Although not in issue nor discussed in the opinion, the lender apparently sought to do so solely on the basis of the cross-collateralization provision. Evidently, no substantive showing was made in support of the lender's request. There was no claim that the lender had suffered a diminution in the value of its pre-petition collateral during the attempt to reorganize. In short, without a basis for entitlement, it was a windfall. That is the harm to be perceived. It creates an issue only if the reorganization effort fails. It will not arise if the effort is successful. It is an issue which is needless to attempt to resolve at this juncture. While the preamble of the stipulation (p. 3) does indicate that the parties believe the Banks are oversecured, it is not so stipulated, nor will the Court make that finding.

The Court does not seek to ignore the fact that with a continuation of the debtor's operation under the proposed arrangement, the Banks may well realize on pre-petition obligations to the extent of the value of the existing inventory and accounts valued by Mr. Roncalato at $6,899,678 and $5,787,981 respectively. Presumably the initial inventory would be used up in the debtor's manufacturing operation. The ensuing product would convert to accounts. Under the credit agreement, the proceeds of this collateral would be collected by the debtor as agent for the Banks and credited to the pre-petition secured debt.

Other than to question the collectibility of all of these accounts, the creditors do not raise objection to this provision of the financing arrangement. New advances based on a formula percentage of inventory and receivables will be secured by all existing and future assets, one side of the cross-collateralization coin. The adequate protection lien under section 363(e), the reverse side of the cross-collateralization coin, is only necessary to protect the Banks to the extent that a diminution in value results from the debtor's use of (as the order recites at page 4) "certain of the Pre-Petition collateral." Presumably this includes all collateral other than inventory and accounts which under the proposal require no protection. Records may be maintained with respect to the inventory used and accounts collected post-petition. Such records and competent testimony with respect to the value of other collateral will establish the extent of the Banks' damages, if any, suffered during the course of the reorganization effort should it fail. There is no useful purpose to be served by a present adjudication of the over/undersecured position of the Banks' pre-petition loans at this time. To the extent indicated, the lien pursuant to section 363(e) would be appropriate and in accord with the substantive provisions of section 361, which states:

**§ 361. Adequate protection**

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

. . . .

(2) providing to such entity an additional or replacement lien *to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property. Emphasis added.*

See, 2 *Collier on Bankruptcy,* 361–10, ¶ 361.01 (15th ed. 1984).

For the reasons hereinabove set forth, the Court is unable to approve the final proposed financing order. Provisions of the July order protect the Banks to the extent of their interim advances.

This order denying approval is stayed ten (10) days to permit either the debtor or U.S. Trust to file an appeal should they deem it appropriate. The protections provided for in the July 2nd order will continue for the same period.

So Ordered.