**In re FCX, INC., ID NO.: 56–0220040, Debtor.**

**Bankruptcy No. S–85–01574–5.**

United States Bankruptcy Court, E.D. North Carolina.

Nov. 14, 1985.

Alfred P. Carlton, Jr., Sanford, Adams, McCullough & Beard, Raleigh, N.C., for debtor.

Lacy H. Reaves, Poyner, Geraghty, Hartsfield & Townsend, Raleigh, N.C., for Unsecured Creditors' Committee.

Howard Glassman, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for Columbia Bank for Cooperatives.

T. Carlton Younger, Jr., Raleigh, N.C., for Texasgulf.

## MEMORANDUM OPINION AND ORDER

A. THOMAS SMALL, Bankruptcy Judge.

The matters before the court are the objections filed by the Unsecured Creditors' Committee ("Committee"), Texasgulf Chemicals Company, Inc., ("Texasgulf") and Willis Hill to the Stipulation Regarding Use of Cash Collateral and Granting of Liens ("Stipulation," approved ex parte by the court on September 18, 1985) and to the Debtor in Possession Loan Agreement ("Loan Agreement," approved by the court on September 23, 1985, after notice and a hearing). The hearing to consider the objections was held in Raleigh, North Carolina on October 24, 1985; notice of the hearing was given to all of the debtor's

creditors and parties in interest. The court withheld ruling pending negotiations between the parties.

## BACKGROUND

FCX, Inc., a North Carolina farmers' purchasing and marketing cooperative, is a debtor in possession (11 U.S.C. § 1101(1)) having filed a voluntary petition under chapter 11 of the Bankruptcy Code on September 17, 1985.

Shortly after filing its petition on September 17, 1985, the debtor and Columbia Bank for Cooperatives ("Bank"), the debtor's primary lender with a lien on virtually all of the debtor's assets, entered into a "Stipulation Regarding Use of Cash Collateral and Granting of Liens." This stipulation, which was approved ex parte by the court on September 18, 1985, permitted the debtor to use $400,000 of the Bank's "cash collateral" to purchase ingredients for feed necessary for the protection and preservation of poultry (1,200,000 laying hens) and livestock (10,000 feeder pigs) owned by the debtor. The Committee objects to the provisions of the stipulation which:

(i) confirm the amount of the Bank's pre-petition claim, (ii) waive any "defense, offset, claim, counterclaim or deduction of any kind or nature whatsoever" of the debtor with respect thereto, (iii) establish the existence, perfection, and priority of the Bank's lien upon the assets of the debtor at the time of the filing of this case, (iv) cross-collateralize the pre-petition and post-petition indebtedness of the debtor to the Bank, (v) limit the payment of costs of administration in this case, and (vi) authorize an automatic lifting of the stay upon the occurrence of certain events without notice and a hearing.

On the afternoon of September 18, 1985, counsel for the debtor and counsel for the Bank appeared before the court at an ex parte hearing to present the outline of a debtor in possession financing arrangement. At the hearing, counsel represented to the court that an emergency situation existed, and that circumstances required

immediate action before creditors could be notified. The essence of the debtor's and the Bank's presentation was that unless the debtor in possession's financing arrangement was approved, FCX would have to close its doors and its assets would greatly deteriorate in value to the detriment of creditors.

The Bank, which already had a lien on all of the debtor's assets, was willing to provide "requirements" financing for the debtor's operations for sixty days in an amount not to exceed $40 million. The Loan Agreement provides that the postpetition loan will be secured by a first lien on all of the debtor's assets, and that the postpetition financing should have the super priority provided by 11 U.S.C. § 364(c)(1). The agreement also provides for the cross-collateralization of both prepetition and postpetition loans, the addition of interest, costs, and attorney's fees to the total indebtedness, automatic lifting of the stay upon default "within 10 days notice," and concessions that (i) the prepetition loan balance of $57,912,696.86 is correct, (ii) the prepetition lien is properly perfected, and (iii) the debtor has no "setoff, deduction, defense or counterclaim" to the Bank's prepetition indebtedness.

At the *ex parte* hearing on September 18, 1985, counsel for the Bank advised the court that the Bank was willing to immediately make advances under the Loan Agreement upon the verbal approval of the Loan Agreement by the bankruptcy court. The Bank further suggested that telephonic notice be given to the 20 largest creditors, and a hearing be held to consider the Loan Agreement on September 23, 1985, to be followed by notice to all creditors, and if objections were filed, a hearing on October 24, 1985. Counsel for the Bank stated that if objections were filed, they would be dealt with at that time.

Based upon the representations of counsel for the debtor and counsel for the Bank, the court indicated from the bench on September 18, 1985, that it would approve the financing arrangement between the Bank and FCX, subject to notice being given to the creditors holding the largest twenty unsecured claims and a hearing on September 23, 1985, and subject further to notice to all creditors and a possible hearing on October 24, 1985.

Telephonic and mailgram notice of the hearing on September 23, 1985, was in fact given to the 30 largest unsecured creditors. An order appointing the Unsecured Creditors' Committee was entered on September 19, 1985, but the Committee had not been organized prior to September 23, 1985. Nevertheless, counsel for three unsecured creditors, Vertac Chemical Corporation, ("Vertac"), Holland Flower Bulb Specialists, and Texasgulf, were present at the hearing and noted appearances. Vertac and Texasgulf are members of the Creditors' Committee.

At both the start and conclusion of the hearing, counsel for Vertac indicated that Vertac did not oppose postpetition financing, but was reserving the right to object and be heard at the subsequent hearing on notice to all creditors. Counsel for the Bank made it clear that the Bank would not advance funds if the liens on all the debtor's assets securing those advances could be invalidated. It was also clear that all creditors would be notified and given the opportunity to object to the terms and conditions of the Loan Agreement.

At the hearing on September 23, 1985, the testimony of Jack R. Taylor, FCX's President and General Manager, Robert L. Wilcox, FCX's Vice President for Operations, and Robert H. Lyford, FCX's Vice President, Treasurer, and Chief Financial Officer, verified the representations previously made by counsel for the debtor and counsel for the Bank at the *ex parte* hearing on September 18, 1985. Based on the evidence presented, the court found that continued operation of FCX was necessary for an effective reorganization of the debtor and to preserve asset values for the benefit of creditors. Furthermore, the court found, based on the testimony of Mr. Taylor and Mr. Lyford, that the debtor was unable to obtain financing, given the time constraints within which it was needed, un-

less the lender received the super priority provided in 11 U.S.C. § 364(c)(1), and unless the lender was given a lien on all of the debtor's assets.

Based upon those findings, the court concluded that the debtor's financing arrangement with the Bank should be approved and an Order Approving Debtor in Possession Financing and Guaranteeing Security Interests and Administrative Expense Priority Pursuant to 11 U.S.C. § 364 was entered at the conclusion of the hearing.

Notice of the order approving the financing arrangement was given to all creditors, objections were filed, and the hearing to consider the objections was held on October 24, 1985.

### THE CHAPTER 11 DILEMMA

One of the first problems faced by a chapter 11 debtor in possession is the need for operating funds. The debtor is prohibited from using cash collateral without court approval or the consent of the secured creditor (11 U.S.C. § 363(c)(2)), and, if the debtor's assets are encumbered, obtaining postpetition financing from a new lender, at least at the beginning of the case, is extremely difficult. The debtor may elect to litigate with the secured lender to obtain the use of cash collateral or to use the secured creditor's collateral to secure a loan from a third party lender. The debtor's other option is to negotiate a postpetition financing arrangement with the secured creditor.

Like the debtor, the secured lender is also faced with a predicament concerning the postpetition financing of debtor's operations. If postpetition financing is not provided, the debtor's business will close, the going concern value of the creditor's collateral will be lost, and the creditor's risk of loss is increased. In spite of those factors, however, creditors are understandably reluctant to lend to a chapter 11 debtor in possession having the protection of the automatic stay and possessing the powers of a bankruptcy trustee.

Frequently, the result is a postpetition financing agreement calling for substantial concessions from the debtor, often at the expense of the rights of unsecured creditors. Section 364 of the Bankruptcy Code provides that, if necessary, the post-petition lender may be given security in the debtor's assets, and a priority ahead of all costs of administration. Many lenders, however, want more, and it is not uncommon for the debtor and the secured creditor to ask the court to approve a lending arrangement containing terms favoring the lender which far exceed those authorized by § 364.

Section 364 accommodates postpetition financing on an expedited basis by allowing the court to approve the granting of security and the super priority after "notice and a hearing." Authorizations for priorities and liens under § 364, unless there has been a lack of "good faith" (see *EDC Holding Company*, 676 F.2d 945 (7th Cir. 1982)), are not affected by a reversal or modification on appeal, unless there was a stay pending appeal. 11 U.S.C. § 364(e). A lender makes advances in reliance upon such orders authorized by § 364 and "(t)he chapter 11 process would be undermined if this Court were to, in effect, undo those orders...." *In re American Resources Management Corp.*, 51 B.R. 713, 722 (Bankr.D.UT 1985). Nevertheless, there is a difference between approval of a priority and a lien, which are specifically authorized under § 364, and other terms which are not. Furthermore, the court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors. *In re B & W Tractor Company, Inc.*, 38 B.R. 613 (Bankr.E.D.N.C.1984).

A debtor in possession may not abandon property rights of the estate unless there has been notice and a hearing (11 U.S.C. § 554(a)). Unless otherwise directed by the court, the debtor in possession is required to give notice of the proposed abandonment to all creditors, indenture trustees, and committees, and parties shall have 15 days, or within a time fixed by the

court, to file objections. (Bankruptcy Rule 6007(a)).

A debtor in possession also may not compromise a dispute unless there has been a "hearing on notice to creditors, the debtor and indenture trustees as provided in Rule 2002(a)." Bankruptcy Rule 9019(a). Rule 2002(a) requires a 20 day notice for the hearing on approval of a compromise, unless the court for cause shown directs that the notice not be sent.

■ For a notice of abandonment or a notice of compromise to be effective, it must identify the property to be abandoned or the dispute to be compromised.

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.... The notice must be of such nature as reasonably to convey the required information ... and it must afford a reasonable time for those interested to make their appearances.... *Mullane v. Central Hanover Bank & Trust Company*, 339 U.S. 306, 314–315, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

In the present case, Texasgulf maintains that it had not been furnished copies of any of the debtor's applications, and had not been given a copy of the Loan Agreement prior to the hearing on September 23, 1985. The debtor's application was, in fact, not filed prior to the hearing, and it appears that the largest 30 unsecured creditors, while receiving notice of the hearing, may not have had sufficient notice of the terms of the Loan Agreement which required the debtor to abandon rights and compromise claims.

■ Even if notice was proper, however, this bankruptcy court has the authority, "(o)n motion and upon such terms as are just," to relieve a party from a final judgment or order for any reason justifying relief. Bankruptcy Rule 9024; Rule 60(b)(6) of the Federal Rules of Civil Proce-

dure. A bankruptcy court has discretionary power to revoke or vacate an earlier order, on good cause shown, if there are no vested intervening rights. *Matter of Emergency Beacon Corporation*, 666 F.2d 754 (2d Cir.1981); *Feldman v. Trans-East Air, Inc.*, 497 F.2d 352 (2d Cir.1974); *Wayne United Gas Co. v. Owens-Illinois Glass Co.*, 300 U.S. 131, 57 S.Ct. 382, 81 L.Ed. 557 (1937); and *Pfister v. Northern Illinois Finance Corp.*, 317 U.S. 144, 63 S.Ct. 133, 87 L.Ed. 146 (1942). This authority should include the modification of terms of financing arrangements between a debtor and a secured creditor which unjustifiably and unreasonably affect the rights of unsecured creditors.

In the present case, however, it is neither necessary to find improper notice nor to utilize Bankruptcy Rule 9024 to reconsider the terms of the Loan Agreement approved by this court by order dated September 23, 1985. The approval of that agreement was, at the suggestion of the Bank, conditioned upon the giving of notice to all creditors and the terms and conditions of the agreement were subject to objections being filed and a hearing on October 24, 1985. With that background, the court will consider the specific objections to the Loan Agreement.

## CONSIDERATION OF OBJECTIONS

### Lien and Super Priority

■ The court finds that the debtor's 30 largest creditors were given 4 days telephonic and mailgram notice of the hearing on September 23, 1985, to consider whether the Bank should be given a § 364(c)(1) administrative expense priority and a lien on all of the debtor's assets to secure a postpetition loan in the amount of $40 million. Given the debtor's immediate need for financing, the notice was appropriate in the circumstances. The Bank made it quite clear at the hearing that it would not advance any postpetition funds unless those advances were secured by all of the debtor's assets, and unless the advances were given a super priority under § 364(c)(1). The court also finds that the debtor could

not obtain the financing on other terms and that the financing was essential to continued operations. If operations were discontinued, there was a strong possibility that the position of unsecured creditors would substantially deteriorate.

-----

Based upon these facts, the court concludes that the requirements of 11 U.S.C. §§ 364 and 102(1) have been satisfied, and the Bank shall have a first lien on all of the debtor's assets and the administrative expense priority of § 364(c)(1) for all postpetition advances made pursuant to the Loan Agreement. The effect of granting such priority may be to limit the payment of other administrative expenses, nevertheless, such a result is authorized by 11 U.S.C. § 364(c)(1).

**Duration of Loan**

■ The undertaking of the Bank to lend $40 million expires on November 19, 1985, (Loan Agreement ¶ 1.1). The Committee contends that the short duration of the loan places an unnecessary hardship on the reorganization efforts of the debtor. That may be so, but the court finds that the expiration is not unreasonable.

-----

A chapter 11 debtor cannot compel a lender to provide postpetition funding, furthermore, the debtor cannot even assume a prepetition lending arrangement (11 U.S.C. § 365(c)(2)). The court certainly cannot extend the term of this Loan Agreement. The court can, however, consider the duration of the commitment in evaluating the reasonableness of specific terms and conditions of the agreement.

**Cross-Collateralization**

■ Paragraph 5.4 of the Loan Agreement provides that all of the debtor's assets, both prepetition and postpetition assets, shall secure all the Bank's prepetition and postpetition claims. The only evidence before the court supports a finding that the Bank's prepetition claim is secured by all of the debtor's assets, including inventory and accounts receivable, and that the value of

the assets, at least on a going concern basis, exceeds the Bank's claim. The court finds that cross-collateralization in these circumstances is reasonable.

-----

■ Clearly, *ex parte* approval of cross-collateralization agreements is not permitted. *In re Texlon Corp.*, 596 F.2d 1092 (2d Cir.1979). One court has held that cross-collateralization, even after notice and a hearing, is not valid. *In re Monarch Circuit Industries, Inc.*, 41 B.R. 859 (Bankr.E.D.PA 1984). Other courts have recognized that cross-collateralization is permissable in some circumstances. *In re Borne Chemical Co., Inc.*, 9 B.R. 263 (Bankr.D.N.J.1981); *In re Antico Manufacturing Co., Inc.*, 31 B.R. 103 (Bankr.E.D.N.Y.1983); *Matter of Flagstaff Foodservice Corp.*, 16 B.R. 132 (Bankr.S.D.N.Y. 1981); *In re General Oil Distributors, Inc.*, 20 B.R. 873 (Bankr.E.D.N.Y.1982); *In re Vanguard Diversified, Inc.*, 31 B.R. 364 (Bankr.E.D.N.Y.1983); and *In re B & W Tractor Company, Inc.*, 38 B.R. 613 (Bankr.E.D.N.C.1984). Cross-collateralization should be discouraged because it can have the effect of giving the unsecured claim of one creditor priority over other unsecured claims. If an undersecured creditor can obtain unencumbered assets as security for all of its prepetition claims, that creditor is being preferred to the detriment of other unsecured claimants. If the creditor's prepetition debts, however, are secured by all of the debtor's assets, and the value of those assets exceeds the claim, the potential for preferential treatment is eliminated. Because of the difficulty in segregating and applying the proceeds of prepetition and postpetition collateral, cross-collateralization should be authorized in the present case as provided in the Loan Agreement.

**Administrative Priority for Prepetition Debt**

■ Paragraph 5.5 of the Loan Agreement provides that the super priority of 11 U.S.C. § 364(c)(1) applies with respect to

"any of the Debtor's obligations hereunder." The Committee contends that this language can be construed to give the Bank an administrative priority for prepetition claims. The evidence before the court indicates that the Bank's claim is fully secured and that there should be no unsecured claim on the part of the Bank. Nevertheless, the court finds that the reasonable interpretation of ¶ 5.5 is that the super priority is extended only to postpetition advances.

-----

 The court may not change the priorities set out in the Bankruptcy Code. *In re B & W Enterprises, Inc.*, 713 F.2d 534 (9th Cir.1983). Section 364(c)(1) authorizes a super priority for postpetition loans; it does not authorize giving a super priority for prepetition loans. Consequently, the court concludes that it may not authorize a § 364(c)(1) priority for prepetition claims. This ruling, however, is without prejudice to the rights of the Bank to claim a priority pursuant to another section of the Bankruptcy Code.

### Payment of Prepetition Indebtedness

 The Committee contends that ¶ 7.4 of the Loan Agreement authorizes or requires the payment of prepetition indebtedness of the debtor. Specifically, ¶ 7.4 requires the debtor to, "pay when due, all taxes, assessments, and other liabilities, except and so long as contested in good faith." This provision is reasonable, but not to the extent that it requires payment of unauthorized prepetition claims.

-----

The debtor may not pay prepetition claims, except as authorized by the court, and ¶ 7.4 should be modified to the extent it purports to require the debtor to make unauthorized payments of prepetition debts. (Payment of certain prepetition debts have been authorized by orders of this court and by the general operating order entered on September 19, 1985, and amended on September 23, 1985).

### Amount of Prepetition Claim, Validity of Prepetition Lien and Release of Claims Against the Bank

Paragraph 6.1 quantifies the amount of the Bank's prepetition claim at $57,912,-696.86; ¶¶ 5.3 and 5.4 confirm the perfection and priority of the Bank's prepetition lien; and, ¶ 6.1 purports to release any "setoff, deduction, defense or counterclaim," which the debtor may have against the Bank. The committee contends that it has not had sufficient time to determine the amount of the Bank's prepetition claim, the validity of the Bank's lien, or the existence of any claim against the Bank, and asks for a reasonable period to investigate and to make those determinations. The debtor's schedules state that the debt is $57,912,697 and that the Bank has a lien on all assets; there is no evidence before the court that the balance of the debt is any different, or that the lien is unperfected.

A brief filed by the Bank states that the "release" is limited.

... Rather, it [the release] is limited in scope and application. The Release is only applicable to claims of the Debtor concerning the validity of the pre-petition debt. Should a third party be able to achieve standing, present a claim, and prove damages, such third party would not be impeded by the Release.

The Release is also limited in scope because it does not limit the Debtor, as debtor in possession, or an eventual trustee from maintaining a preference action under Section 547 of the Bankruptcy Code (11 U.S.C. 547), a fraudulent transfer action under Section 548 (11 U.S.C. 548), or such other action that may arise pursuant to the Bankruptcy Code.

 The provisions establishing the amount of the indebtedness, conceding the validity of the lien, and releasing claims are reasonable as to the debtor, but are not reasonable with respect to creditors and other parties in interest. A reasonable period of time to determine the amount and validity of the Bank's secured claim is 30 days from the date of this order. A rea-

sonable period of time to determine the existence of claims against the Bank is 60 days.

-----

■ Section 502 of the Bankruptcy Code allows a party in interest to object to the allowance of a claim. The debtor may not waive that right on behalf of creditors. A debtor may, however, waive its right to object. A debtor should know the amount of the claim, and in this case, the debtor appears to have no doubt as to the balance outstanding.

■ While the debtor is bound by its agreement regarding the loan balance, the creditors are not. The Bank, however, if it is to continue financing the debtor's operations, is entitled to know if there are challenges to the amount of its claim. It is also entitled to know whether there will be challenges to the validity of its prepetition lien, and whether it must defend claims. While the Loan Agreement should preclude the debtor from objecting to the amount of the Bank's prepetition indebtedness, and from challenging the validity of the Bank's prepetition lien, the Committee shall have 30 days from the date of this order to raise any challenges to the amount of the Bank's prepetition claim or to the validity of the Bank's prepetition lien. The Committee shall also have 60 days from this date to raise claims against the Bank. The court is aware that the Loan Agreement expires on November 19, 1985, unless extended. If the Loan Agreement is not extended, there is no need for the 30 day or 60 day limitations, and in the event of nonrenewal beyond the limitation dates, creditors and parties in interest may raise objections without regard to the 30 or 60 day limitations.

## Increase in Prepetition Claim

The Committee objects to the amount of the Bank's prepetition claim to the extent increased by the addition of fees, expenses, and interest. (¶¶ 6.1 and 11.5). The Committee also asks that costs and fees be preapproved before they may be incurred by the Bank.

-----

■ Section 506(b) allows interest, reasonable fees, costs or changes provided for under the loan documents to be added to a secured debt if the value of the collateral is sufficient to cover these items. The evidence before the court is that the Bank's prepetition debt is fully secured. If it should be determined that the claim is not fully secured, postpetition interest, fees, costs, and charges should not be added. The court will not require preapproval of costs and fees, but such costs and fees are, of course, subject to the court's scrutiny for reasonableness.

## Payment of Bank's Prepetition Claims

Paragraphs 6.4 and 6.5 of the Loan Agreement provide for payments with respect to the Bank's prepetition claims. The Committee maintains that such payments should be subject to further determination of the existence, perfection, and priority of the Bank's prepetition lien.

-----

■ The court agrees that the Bank's right to retain such payments should be subject to further determination on objection by a party other than the debtor, of the existence, perfection, and priority of the Bank's prepetition lien and the Loan Agreement should be modified accordingly.

## Events of Default

The Committee objects to the events of default as being unconscionable, overreaching, and unnecessary for the protection of the Bank's claim. The events of default are set out in ¶ 10.1 and include:

(a) The appointment of an interim trustee or trustee in the chapter 11 Case, or the appointment of an examiner to perform any of the duties of a trustee or debtor other than those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code;

(b) The dismissal of the Chapter 11 Case or the conversion of the Chapter 11 Case to a case under Chapter 7;

(c) The venue of Debtor's Bankruptcy Case is changed from the United States Bankruptcy Court for the Eastern District of North Carolina;

(d) Cancellation and lapse of Debtor's products liability, comprehensive public liability, fire, hazard, or comprehensive public liability or workers' compensation insurance, insurance coverage, or fidelity bond coverage, if such default shall continue for ten (10) days after its occurrence;

(e) Any material adverse change in the business or financial condition of Debtor, if such default shall continue for ten (10) days after its occurrence; or

(f) Any breach of or default by Debtor of any other term, condition, or covenant under the Chapter 11 Financing Agreements.

█ The court finds that events of default (a) through (e) are reasonable, but the court does not have sufficient evidence before it to determine the reasonableness of event of default (f). The court has never seen the Chapter 11 Financing Agreements, and cannot tell whether the terms of the Financing Agreement are appropriate.

-----

Based on the foregoing facts, the court concludes that the objection with respect to events of default (a) through (e) should be denied. The court will consider the reasonableness of event of default (f) if it should ever become necessary.

**Automatic Lifting of Automatic Stay**

█ Paragraph 10.1 of the Loan Agreement says that in the event of default the Bank shall be automatically relieved of any obligation to make advances and "within ten (10) days of mailing of notice of termination, shall further be relieved of any further stay or other restriction on enforcement of its liens...." The court assumes that "within" 10 days notice in fact means "upon 10 days notice" or "after 10 days notice," and finds that this provision is reasonable in view of ¶ 10.2 of the Loan Agreement which says,

The financing arrangements described herein as provided in Section 1 may be terminated or modified upon notice and hearing, for cause.

Pursuant to that provision, the debtor, the Bank, or a party in interest could, presumably, on "notice and hearing" ask the court, within the 10 day notice period, to extend the automatic stay "for cause."

-----

Based upon these facts and the terms of the Loan Agreement, specifically ¶ 10.2, the court concludes that the automatic stay provision in ¶ 10.1 should not be modified.

**Reclamation Claims**

█ Texasgulf, as well as others, has made a claim for reclamation against the debtor pursuant to § 546(c), and argues that the Loan Agreement should not affect any creditor's reclamation rights. The court agrees that the Loan Agreement should not prejudice the rights of any reclaiming creditor against either the debtor or the Bank.

**Stipulation Regarding Use of Cash Collateral and Granting of Liens**

The use of $400,000 by the debtor for the emergency purchase of feed was necessary for the protection and preservation of poultry and livestock owned by the debtor. While the use of the funds should be approved, the Stipulation contains many of the same provisions which the court has found objectionable in the Loan Agreement. The Stipulation and the Loan Agreement establish the framework for the Bank's postpetition loan to the debtor. Consequently, based upon the findings and conclusions stated herein, those provisions of the Stipulation which are similar to those in the Loan Agreement found to be objectionable by the court shall be modified to coincide with the modifications made by the court to the Loan Agreement.

\* \* \* \* \* \*

Based upon the foregoing, the terms and conditions of the Debtor In Possession Loan Agreement, the Stipulation Regard-

ing Use of Cash Collateral and Granting of Liens, the Order dated September 18, 1985 approving the Stipulation, and the Order dated September 23, 1985 approving the Loan Agreement shall be modified as set forth herein.

SO ORDERED.