**In re TENNEY VILLAGE COMPANY, INC., Debtor.**

**Bankruptcy No. 89–536.**

United States Bankruptcy Court, D. New Hampshire.

July 31, 1989.

Mark W. Vaughn, Devine, Millimet, Stahl & Branch, PA, Manchester, N.H., for debtor.

Robert J. Keach, Verrill & Dana, Portland, Me., William S. Gannon, Wadleigh, Starr Offices, Manchester, N.H., for Maine Bank.

Bruce A. Harwood, Sheehan, Phinney, Bass & Green, Manchester, N.H., for Fidelity Bank.

Charles L. Glerum, Choate, Hall & Stewart, Boston, Mass., for Bank of New England.

OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

Tenney Village Company, Inc. (the "Debtor") moves for approval of its Chap-

ter 11 secured financing agreement (the "Financing Agreement") with Maine Savings Bank ("the Bank"). Objections have been lodged by other lienholders and the committee of unsecured creditors. The Financing Agreement proposes an additional real estate mortgage to the Bank having priority over other lienholders; it would also grant numerous procedural and substantive rights to the Bank during the reorganization. Disposition of the motion involves largely undefined principles concerning the standards for valuation of security interests and the extent to which an agreement for Chapter 11 financing may benefit the lender.

The Debtor operates a ski area at Tenney Mountain, New Hampshire encompassing some 1,000 acres which contain twenty-seven trails, two major lifts and three minor lifts (the "Ski Area"). The Debtor is also engaged in the construction and sale of condominium units on a tract (the "Condominium Tract") adjoining the Ski Area. On March 24, 1987, in order to finance the condominium project, the Debtor and its two principals, Robert C. Palcilli and George M. Diemer, executed as co-makers a $15,650,000 construction loan agreement with the Bank whose advances were to be secured by the Condominium Tract and related personal property. Some sixty-seven condominium units have since been constructed, of which twenty-eight have been sold. The Debtor has substantially completed the sewer system. The Bank is now owed about $16,500,000 under the construction loan and about $100,000 under a reimbursement agreement executed in connection with a letter of credit issued for construction of the sewer system. It holds a first mortgage and security agreement covering only the Condominium Tract and related personal property.

The Debtor has financed improvements to the Ski Area through bonds issued by the Industrial Development Authority of the State of New Hampshire under a first trust mortgage and security interest (the "trust mortgage") covering the Ski Area and related personal property. This debt has a present balance of about $1,300,000. Bank of New England, N.A. ("BNE") is the

trustee of the trust mortgage; all the bonds are held by Fidelity Bank of Philadelphia ("Fidelity"). The Debtor owes Samuel G. Hall and Bernice M. Hall (the "Halls") about $600,000 under its 1985 purchase of both parcels of real estate from the Halls. Securing this debt is a mortgage and security agreement (the "Hall mortgage") on both the Ski Area and Condominium Tract which is expressly subordinate to any future mortgage or security interest securing payment of funds borrowed for construction or improvement of the property. BNE also holds on its own behalf an attachment lien and a mortgage (the "BNE lien") securing loan indebtedness of about $500,000 and covering both the Ski Area and Condominium Tract.

The Financing Agreement proposes an additional $1 million loan from the Bank; the proceeds would be used for improvement of both the Ski Area and Condominium Tract. The Debtor wishes to enhance the quality of ski trails and facilitate snowmaking on them through regrading and erosion control measures. Ski Area equipment is in need of repair, particularly a snow-making pipeline which is not now operational, and the pond supplying water for snow-making requires redredging. Substantial erosion control and site improvement work is also planned for the Condominium Tract. The Financing Agreement, as modified on the record at the recent hearing, would grant the Bank a mortgage upon the Ski Area and the Condominium Tract securing its entire pre-petition and post-petition debt and having absolute priority over the BNE lien covering the Condominium Tract and limited priority over the trust mortgage and the BNE lien covering the Ski Area. The latter priority would exist only with respect to the requested new advances to the extent that they are used to pay projected expenditures totaling about $778,000 for general operations and improvement of the Ski Area.

## I. LIEN PRIORITY

The Bank seems to suggest in its trial memorandum that approval of these priorities is not now before the Court because

the interim order entered by another judge of this Court, which allowed $55,800 of advances, approved the Financing Agreement and set a date for the final hearing "on the sole matter of the authority of the Debtor to borrow funds in excess of $55,-800 under the terms and conditions of the [Financing Agreement] ..." The question of priorities, and indeed all the provisions of the Financing Agreement, nevertheless remain open. The interim order, drafted by Bank counsel, was issued on one day's telephonic notice. Such financing agreements may be finally approved on no less than fifteen days' written notice, unless the Court shortens the notice period. Bankr.R. 4001(d). Here the prior judge required thirty days' notice of the final hearing because of his concern that creditors receive adequate notice. A reasonable inference from other provisions of the interim order, moreover, is that the order reserved to the court at the final hearing jurisdiction to pass on the entire Financing Agreement, including its proposed priority of liens.

A Chapter 11 debtor may obtain credit secured by a lien with priority which is senior or equal to that of an existing lien only if "(A) the [debtor] is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the [other] lien...." 11 U.S.C.S. § 364(d) (Law. Co-op. 1985 & Supp. 1989). The parties introduced evidence concerning both of these requirements, but I will deal only with the question of adequate protection for the other lienholders. The Debtor has the burden of proof on this issue. § 364(d).

The Debtor argues that Fidelity's trust mortgage would receive adequate protection in the proposed finding because the Ski Area should be valued under a going concern standard of valuation through a discounted cash flow method, and that this value is $2,354,000, as testified to by its expert who assumed for the purpose of his opinion that the projected improvements have been made. From this amount the Debtor deducts the proposed priming lien of $778,000, leaving $1,576,000 in value for the $1,300,000 in trust mortgage debt. The Debtor justifies use of a going concern

standard of valuation by its plan to remain in operation and sell the Ski Area as a going business. Alternatively, the Debtor urges the presence of adequate protection for the trust mortgage on the theory that the projected improvements will enhance what would otherwise be its liquidation value of $759,000 by at least the $778,000 primary lien, and that the new going concern value could be as little as $1,600,000 for this enhancement to take place. Neither the BNE lien nor the Hall mortgage, says the Debtor, is an interest worthy of protection because (i) neither has value in its coverage of the Condominium Tract due to the Bank's senior lien, and (ii) without the proposed funding the Debtor will be forced to cease operations and liquidate its Ski Area assets; both experts agree that this would pay these junior liens nothing. In this fashion the Debtor rather inconsistently applies a liquidation value to these junior interests and finds them presently valueless. The Debtor also points to the automatic subordination provision of the Hall mortgage as further reason to disregard its interest. I shall treat only the most senior lien covering the Ski Area, the trust mortgage, because I conclude that the Debtor's argument as to this lien is without merit.

A mortgage or security interest is to be valued "in light of the purpose of the valuation and of the proposed disposition or use of [the] property...." 11 U.S.C.S. § 506(a) (Law. Co-op. 1985 & Supp. 1989). The omission from the statute of valuation standards was intentional. The House Report states:

"Value" does not necessarily contemplate forced sale or liquidation value of collateral; nor does it always imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case. H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6312.

The factors mentioned in the statute are of little aid in determining the proper standard for valuing Fidelity's interest under

the trust mortgage after the proposed financing. The "purpose of the valuation" seems relevant only for application of the so-called "best interest of creditors" test under § 1129(a)(7)(A) where a Chapter 7 liquidation is necessarily hypothecated. *Collier* finds guidance in the statutory phrase "proposed ... use of such property." In discussing the impact of this phrase upon the valuation of a security interest in a Chapter 11 context, *Collier* states:

> Such a value of the subject property might be characterized as its replacement value to the debtor, fair market value, its going concern value or, if a successful reorganization appears clearly assured, a value which takes into consideration not only the tangible value of the property but also the earnings to be derived therefrom. On the other hand, if prospects for a successful reorganization appear dim, the value may more appropriately be determined on the basis of the value the holder of the secured claim could obtain for the property upon a disposition after the debtor's retention and use has ended.

3 *Collier on Bankruptcy*, ¶ 506.04 at 506–28 (15th ed.).

Section 506(a) requires, however, a determination not of the value of the collateral but of "the value of such creditor's interest in the estate's interest in such property...." This interest consists primarily of the right to foreclose and, where the Uniform Commercial Code controls, the obligation to do so in a commercially reasonable manner. U.C.C. § 9–504. That a debtor appears to be a viable business having going concern value might make foreclosure unlikely, but it has precious little to do with valuation of the security interest. A security interest is worth what it will bring at foreclosure. *In re Claeys*, 81 B.R. 985 (Bankr.D.N.D.1987). Foreclosure upon operating business assets, moreover, will likely terminate operations, if indeed they have not previously ceased. In any event, valuation under a going concern standard is negated by the financial distress that is certain to be present at foreclosure, even if the security consists of all the assets necessary for the business to continue in operation. Some of the decisions lose sight of the distinction between the value of collateral and the value of the creditor's interest in it. *See, e.g., In re Helionetics, Inc.*, 70 B.R. 433 (Bankr.C.D.Cal.1987) (junior security interest in all operating assets valued at going concern value of business less prior liens because of possibility that debtor's reorganization would be successful); *In re Automatic Voting Mach. Corp.*, 26 B.R. 970 (Bankr.W.D.N.Y.1983) ("liquidation value" of real estate and equipment rejected in favor of "going concern or fair market value"); *In re QPL Components, Inc.*, 20 B.R. 342 (Bankr.E.D.N.Y.1982) (security interest in inventory of operating Chapter 11 debtor valued at inventory's retail value rather than its cost); *In re Shockley Forest Indus., Inc.*, 5 B.R. 160 (Bankr.N.D.Ga.1980) (real estate mortgage valued at fair market value of real estate with no deduction for foreclosure expenses).

*In re Beker Indus. Corp.*, 58 B.R. 725 (Bankr.S.D.N.Y.1986), relied upon by the Bank, permitted senior liens under § 364(d) based upon a going concern standard of valuation. Because the debtor was operating its business, the court reasoned, the obligation to foreclose in a commercially reasonable manner would require creditors holding first liens to operate the business and sell it as a going concern. The court did not explain why present operating conditions should be equated with conditions likely to be present at foreclosure. Nor did it mention the legal and practical obstacles faced by a secured creditor who wishes to operate the business at foreclosure. *See, e.g., State Nat'l Bank of El Paso v. Farah Mfg. Co., Inc.*, 678 S.W.2d 661 (Tex.Ct.App.1984) (secured creditor exercising control over debtor's operations held liable in tort to debtor); *Bergquist v. First Nat'l Bank of St. Paul (In re Am. Lumber Co.)*, 7 B.R. 519 (Bankr.D.Minn.1979), *aff'd* 5 B.R. 470 (D.Minn.1980) (subordination of claim of secured party who received a preference and operated debtor's business at foreclosure); *In re Process–Manz Press, Inc.*, 236 F.Supp. 333 (N.D.Ill.1964) (subordination of

claim of secured party who received fraudulent transfer and operated debtor's business at foreclosure).

The Bank also cites the pre-Code case of *Chem. Bank & First Pa. Bank, N.A. v. American Kitchen Foods, Inc. (In re American Kitchen Foods, Inc.)*, 2 B.C.D. 715 (Bankr.N.D.Me.1976). The court there enunciated the wise principle that security interests should be valued in light of the U.C.C. requirement that foreclosure be undertaken in a commercially reasonable manner. The court in fact went further, holding that the standard of valuation of security interests should be the value obtainable by the secured party through the *most* commercially reasonable disposition of the collateral which is practical in the circumstances. It rejected forced sale value as a standard unless the debtor's circumstances, or the nature or condition of the collateral, leaves no other commercially reasonable alternative. The decision emphasizes the contradiction in using forced sale values where the debtor is operating the business as a going concern and selling the collateral (which was inventory) in normal course.

*American Kitchen* does not hold that a security interest in some or all assets of an operating business is to be measured by going concern value, a proposition for which it is sometimes cited. Going concern value is the value of an entire business; it is calculated based upon net profit rather than the value of individual assets, on the theory that the true value of a business, assuming no excess assets, is its ability to earn a profit. Either one of two approaches is taken. As the Bank's expert did here, the appraiser can project net income over a period of, say, ten years, and then discount that stream of income to arrive at its present value. *See, e.g., In re Wabash Valley Power Ass'n, Inc.*, 77 B.R. 991 (Bankr.S.D.Ind.1987). The other approach concentrates upon past earnings and arrives at a future base annual earnings figure, taking into account any trend and typically giving more weight to the recent years. This sum is then multiplied by a factor which represents what is considered to reflect a reasonable capitalization multiple. *See, e.g.,* A. Dewing, *Financial Policy of Corporations*, 287–90 (5th ed. 1953); J. Bonbright, *The Valuation of Property*, 237–38 (1937); B. Graham, D. Dodd and S. Cottle, *Security Analysis*, 468–538 (4th ed.). The court in *American Kitchen* did not concern itself with past or projected earnings. Nor was it attempting to value the entire business. The court did not even adopt retail value of property as the proper standard; its actual holding merely approved the values urged by the debtor, which were the *cost* of its inventory and the fair market value of other *individual assets*.

There is one situation where valuation of security interests under a going concern valuation standard is proper. That is where the valuation is made in the context of the sale of the debtor's business as a going concern and the secured claim is to be paid from the proceeds. Here there may be an allocation problem, but it would be ludicrous to adopt another standard or, if an actual sale has been negotiated, to use any value other than the agreed price. That seems obvious. A more difficult question is presented when the debtor is attempting to sell the business but may not be successful. Those were the circumstances of *In re Phoenix Steel Corp.*, 39 B.R. 218 (D.Del.1984). The debtor sought priming liens for new short-term financing. Management's game plan was to stay in business long enough to find a buyer able to invest needed capital, and it had hired an experienced investment banker who was busy beating the bushes for a buyer. By the time of the hearing he had attracted some preliminary inquiries but had no solid prospects. The court viewed valuation of the collateral as being largely dependent upon two critical contingencies—whether the debtor would stay in operation long enough for a buyer to be found and whether a buyer could be found at all. Because of these contingencies, the court concluded that the business was worth less than the values offered in evidence, and it discounted these values. Arriving at a total value which was less than the present secured

debt, it refused to authorize the financing. This approach seems proper.

The Debtor's business plan, endorsed by the Bank, is to improve its present facilities and sell both the Ski Area and the completed condominium units. It has not yet hired a broker. No potential buyer has seen the property. The Debtor has posted consistent operating losses. The Financing Agreement would require that the proposed $1 million loan and all present Bank debt be due in full at the end of this year, in the middle of the ski season. Having in mind all of these circumstances, I conclude that the Debtor has a slim chance of remaining in operation long enough to effect a sale, or of selling its business at any time at a going concern value based upon income potential. The trust mortgage should therefore be valued based upon asset valuations rather than discounted or capitalized earnings. The Debtor's own expert places this value at $759,000 for equipment plus an unspecified small amount for the real estate as woodland. Rather than affording adequate protection, this value means that the proposed first lien would consume almost the entire value of the trust mortgage.

Nor has the Debtor sustained its burden of proof concerning adequate protection even if a going concern standard applied generally to operating businesses. The Debtor tried to show that the going concern value of the Ski Area exceeds $2,078,000 the total of the $778,000 priming lien and the $1,300,000 trust mortgage debt. But its expert ignored much of the Debtor's financial history and dwelled upon a picture of the future which is rosy indeed. The expert who testified for Fidelity and BNE was more practical, relying on his greater experience. He agreed that the proper way to value a ski resort is through a discounted projection of net earnings. But he saw far less growth potential than did the Debtor's expert, and he was therefore unable to project an operating picture which differed from the deficit operations of the past. He therefore concluded that the Ski Area has no going concern value and a liquidation value of $881,000. He also was of the opinion, however, that the property has some minimal worth as an amenity to the condominiums, and that this value is $975,000. I find that the value of the trust mortgage covering the Ski Area is $975,000, the fair market value of its assets as testified by this expert. Although this is not necessarily what the property would bring from public auction at foreclosure, the trustee of the trust mortgage has the ability to bid in and obtain fair market value through later private sales. This value obviously fails to provide adequate protection for the trust mortgage debt of $1,300,000, even without considering the requested priming lien.

## II. OVER-ALL EFFECT OF FINANCING AGREEMENT

The Financing Agreement, which runs to 47 pages, would give the Bank numerous rights concerning the Debtor's operations and the Chapter 11 reorganization. The Bank must first approve all specifications for the planned improvements, and the work is to be done under the direct supervision of the Bank's consultant who would have authority to stop the work at any time. The Debtor is required to hire a new chief executive officer who must be approved by the Bank; if the Debtor later fires him without the Bank's consent, the entire debt is subject to acceleration. The Debtor must obtain the Bank's prior approval of its plan to market condominium units; it also must hire a new marketing firm approved by the Bank. All sales of condominium units are to be at prices which meet specified minimum unit values, and all proceeds from unit sales, less only a broker's commission, must be remitted to the Bank. The Debtor would have to deposit other sales and rental proceeds in a collateral account at the Bank; the Bank could apply the balance in this account to its debt at any time.

The Bank's rights in the Chapter 11 reorganization are striking. The Bank is to hold $50,000 of the new loan in escrow for the fees and expenses of Debtor's counsel, who received a $25,000 retainer. Debtor's counsel is to be paid nothing from this account for any services devoted to claims

or defenses against the Bank. Counsel agrees to give the Bank a monthly accounting of his services and expected fees, which cannot exceed $150 per hour and are subject to court approval. The entire amount of the Bank debt is given the highest administrative expense priority. The occurrence of any so-called "termination event" vacates the automatic stay to permit foreclosure, without further order of court, unless during a seven day notice period the Debtor obtains a court order preventing foreclosure. This order may issue only if no termination event has occurred or there has been a "material change in circumstances." Among the termination events are: (i) a plan of reorganization being confirmed over the Bank's objections, (ii) a third party obtaining relief from the automatic stay without the Bank's consent, and (iii) any creditor or other party in interest taking any action against the Bank. The Debtor, finally, waives all claims and defenses against the Bank, including the right to assert its preference, fraudulent transfer or other avoiding powers.

Under the guise of financing a reorganization, the Bank would disarm the Debtor of all weapons usable against it for the bankruptcy estate's benefit, place the Debtor in bondage working for the Bank, seize control of the reins of reorganization, and steal a march on other creditors in numerous ways. The Financing Agreement would pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the Bank and the Debtor's principals who guaranteed its debt. It runs roughshod over numerous sections of the Bankruptcy Code. Under its rights of approval and supervision, the Bank would in effect operate the Debtor's business. The Code permits this to be done only by a debtor or trustee. § 1108. All proceeds and rents would go to the Bank or to a collateral account it controls. The bankruptcy estate is supposed to receive all proceeds and rents from estate property, subject to cash collateral rights of secured parties. §§ 541(a)(6), 363. And the Bank would have the ultimate say over the very goal of this Chapter 11 case, a confirmed plan of reorganization. No longer could a plan be confirmed over the Bank's objection under the cram-down provisions of § 1129(b)(2)(A). Such a confirmation is a "termination event" which gives the Bank the right to foreclose upon all the Debtor's property without further order of court, assuming "no material change in circumstances," whatever that means. The automatic stay against foreclosure, and all questions concerning the Bank's adequate protection, become irrelevant despite the strictures of § 362.

Equally shocking is the Bank's attempt to disarm the representative of the bankruptcy estate. Its existing liens would become unassailable even before appointment of counsel to the creditors' committee, and it is given iron-clad defenses to all claims that might be asserted on the estate's behalf, whether they pertain to preference, fraudulent transfer, lender liability, subordination or any other matter. Surely no such right could be "burdensome" so as to qualify for abandonment under § 554. Nor has there been any attempt to demonstrate that these rights are of "inconsequential value," another ground for abandonment. If they have such little value, the Bank does not need the protection.

Not content with this, the Bank would close the purse strings to payment of Debtor's counsel for services devoted to any claim or defense against the Bank, except for the $25,000 retainer. Once this retainer is consumed, and retainers seem to go quickly these days, counsel could not expect to be paid in any contest with the Bank, whether it involves claims against the Bank for monetary recoveries or such matters as contesting the Bank's right to foreclose following a "termination event." There is no other source for payment of fees. Counsel therefore has an economic incentive to concentrate his efforts elsewhere, perhaps on matters less fruitful for the estate, even though his intentions may be pure. This temptation makes him doubly disqualified under § 327(a). He holds "an interest adverse to the estate" and he is not "disinterested." *See, e.g., In re Martin,* 817 F.2d 175 (1st Cir.1987) (debtor's

mortgage securing counsel's fee may constitute an adverse interest depending upon the circumstances); *In re Philadelphia Athletic Club, Inc.*, 20 B.R. 325 (E.D.Pa. 1982) (firm which had represented a 50% owner of debtor in attacking a plan of reorganization proposed by other owner held to have materially adverse interest and thus could not represent Chapter 11 trustee, even though the firm had resigned from the prior representation, because its advice was likely to be unconsciously colored by its prior representation, and because of appearance of impropriety under Canon 9); *In re Roberts*, 46 B.R. 815 (Bankr.D.Utah 1985), *rev'd. on other grounds* 75 B.R. 402 (D.Utah 1987) (law firm which represented individuals in their bankruptcy case denied all fees in representation of individuals' corporation in its Chapter 11 case by reason of cross liabilities between individuals and corporation); *In re Guy Apple Masonry Contractor, Inc.*, 45 B.R. 160 (Bankr.D.Ariz.1984) (materially adverse interest present where counsel for Chapter 11 debtor also represented debtor's landlord, to whom the debtor owed substantial back rent; court relied in part upon Canon 9 concerning appearance of impropriety).

It is said that a Chapter 11 lender should not be required to finance the prosecution of claims and defenses against it. That is true. If the lender believes that this will occur, it can elect not to make the loan. It cannot expect, however, to change the rules of a Chapter 11 case. We have here much more than the common provision giving counsel to a creditors' committee a limited period to object to a lender's liens.

Fidelity and BNE argue that the Debtor's agreement to these provisions violates the Debtor's fiduciary obligations owed the bankruptcy estate and its creditors. As the representative of the bankruptcy estate, the Debtor does assume many of the fiduciary obligations of a Chapter 11 trustee, such as the duty to account to creditors, to file a Chapter 11 plan, to avoid for the benefit of the estate preferences, fraudulent transfers or liens inferior to a judgment lien, and to assert for the estate all of the Debtor's causes of action. 11 U.S.C.S. §§ 1106, 1107, 704, 541, 544, 547, 548 and 551 (Law.Co-op.1985 & Supp.1989). The Debtor's board of directors also continues to owe fiduciary obligations to the stockholders, and for this purpose the Debtor may act in some degree for its own benefit. It may, for example, negotiate a plan of reorganization having in mind its own interests. A prime function of a creditors' committee is to represent creditors against the debtor in these negotiations. § 1103(c)(3). But the general mandate of the Bankruptcy Code is clear. The Debtor's pervading obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries. This is in accordance with the principle that the interests of creditors outweigh those of stockholders when a corporation is insolvent or on the brink of insolvency. *See, e.g., McCandless v. Furlaud*, 296 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121 (1935) (state court receiver of insolvent corporation permitted to enforce fiduciary obligations of controlling shareholder—promoter notwithstanding shareholder consent to transaction in question). I conclude that the execution of the Financing Agreement violates the Debtor's fiduciary obligations to the estate. *In re Roblin Indus., Inc.*, 52 B.R. 241 (Bankr.W.D.N.Y.1985).

The Financing Agreement would also enhance the Bank's lien rights beyond the priorities previously discussed. For the first time, the Ski Area would become security for the Bank's entire pre-existing debt, not just security for the new $1 million advance. No suggestion is made that the Bank is now adequately secured by the Condominium Tract. As stated by Judge Friendly in the leading decision, only euphemistically can such a provision be called "cross-collateralization;" it is a post-petition preference for which no statutory authority can be found. *Otte v. Mfrs. Hanover Commercial Corp. (In re Texlon Corp.)*, 596 F.2d 1092 (2d Cir.1979). Although the *Texlon* court ultimately rested its decision on the absence of adequate notice to creditors, the court seemed to view cross-collateralization as impermissible under either the prior Bankruptcy Act

or the present Bankruptcy Code, without regard to the question of notice, and the decision has been so interpreted. *See, In re Monach Circuit Indus., Inc.*, 41 B.R. 859 (Bankr.E.D.Pa.1984). Section 364(d) speaks only of the granting of liens as security for new credit authorized by the Court. The *Monach* decision interprets this to prohibit the grant of additional security for pre-petition debt. *See also, In re Ellingsen MacLean Oil Co., Inc.*, 834 F.2d 599, 601 (6th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 55, 102 L.Ed.2d 33 (1988) ("The express language of this subsection suggests that the priority or lien granted thereunder is limited to securing the newly incurred debt authorized by that provision.")

Other courts read *Texlon* differently, stressing the court's choice to rest its holding upon notice deficiencies. These courts have permitted cross-collateralization, but they have done so where no party objected or the lender's pre-petition debt was clearly well secured, hardly the situation here, or in order to continue a pre-petition security interest in receivables. *See, e.g., In re Beker Indus. Corp.*, 58 B.R. 725 (Bankr.S. D.N.Y.1986) (creditors' committee consented); *In re Vanguard Diversified, Inc.*, 31 B.R. 364 (Bankr.E.D.N.Y.1983) (no objection); *In re Gen. Oil Distribs., Inc.*, 20 B.R. 873 (Bankr.E.D.N.Y.1982) (pre-petition interest in receivables continued post-petition); *Borne Chem. Co., Inc. v. Lincoln First Commercial Corp. (In re Borne Chemical Co., Inc.)*, 9 B.R. 263 (Bankr.D. N.J.1981) (pre-petition debt fully secured). At least one court has allowed cross-collateralization in the context of new financing despite objection by other creditors and the possibility that the pre-petition debt was undersecured. *In re FCX, Inc.*, 54 B.R. 833 (Bankr.E.D.N.C.1985). This court saw a benefit to the estate through preservation of the going concern value of assets, without attempting to measure that benefit against the detriment from the "preference." *See, In re Roblin Indus., Inc.*, 52 B.R. 241 (Bankr.W.D.N.Y.1985). Decisions refusing to disturb cross-collateralization provisions on appeal are of course distinguishable. They rely upon that mandate of

§ 364(e) that liens and priorities rights granted in bankruptcy court financing orders shall not be altered on appeal, absent a stay, if the lender has already extended credit in good faith. *See, e.g., In re Ellingsen MacLean Oil Co., Inc.*, 834 F.2d 599 (6th Cir.1987); *In re Adams Apple, Inc.*, 829 F.2d 1484 (9th Cir.1987).

One writer contends that because cross-collateralization is linked to new financing designed to rehabilitate a debtor, a court may approve the transaction under its § 105(a) power to "issue any order ... necessary or appropriate to carry out the provisions of [title 11.]" *See,* Bohm, *The Legal Justification for the Proper Use of Cross–Collateralization Clauses in Chapter 11 Bankruptcy Cases,* 59 Am.Bankr. L.J. 289 294–301 (1985). This position glosses over the apparent conflict with § 364(d). It also seems to assume something which is certainly not present here, that the ultimate intangible benefit to the bankruptcy estate from the proposed financing exceeds the immediate detriment it suffers from the cross-collateralization. Here only one party will benefit from the proposed reorganization—the Bank. And even if that were not so, there would have to be a clear likelihood of successful reorganization and an obviously equivalent intangible benefit to the estate from the financing before this Court would be tempted to use its § 105(a) powers. That is not the case here.

The Financing Agreement is also objectionable in its attempt to give administrative expense priority to the unsecured portion of the Bank's pre-petition debt. There is no authorization in § 364 for a court doing this, nor may a court change the priorities set forth in § 507. *In re FCX, Inc.*, 54 B.R. 833 (Bankr.E.D.N.C.1985).

### III. STATUS OF INTERIM LOAN

The amount loaned under the interim order shall continue to be secured by the Condominium Tract and the Ski Area. The Bank's lien on the Ski Area is limited to securing that amount. Pursuant to the express terms of the interim order, the Bank's lien on the Ski Area is subordinate

to the trust mortgage. The Bank stipulated at the most recent hearing that the priority which it seeks is limited to $778,000 with respect to the BNE lien, even though the Financing Agreement provides that the limitation applies only to the trust mortgage. In view of this grouping of the trust mortgage with the BNE lien, I interpret the stipulation also to mean that the Financing Agreement has been amended to provide that pending the final order the new mortgage is subordinate to the BNE lien as well. In any event, the entire matter of priority necessarily remained open due to lack of fifteen days notice under B.R. 4001. The Bank's lien on the Ski Area for its interim advance is therefore subordinate also to the BNE lien and any other liens on the Ski Area, except for the Hall mortgage which has its own subordination provision.

There may indeed be some question of whether the interim loan should now be considered a valid debt at all, or whether, if valid, it should be subordinated due to the Bank's overreaching. I leave the question of subordination, but not debt existence, open. *See In re Clark Pipe & Supply Co., Inc.,* 870 F.2d 1022 (5th Cir.1989). Neither question appears to be of consequence in view of the Ski Area's low value and the apparent absence of unencumbered assets.

A separate order denying the motion has issued.