The **OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NEW WORLD PASTA COMPANY, Appellant,**

v.

**NEW WORLD PASTA COMPANY, et al., Appellees.**

No. 04CV1873.

United States District Court, M.D. Pennsylvania.

March 23, 2005.

Bonnie G. Fatell, Mark J. Packel, Blank Rome LLP, Wilmington, DE, Bonnie Steingart, Vivek Melwani, Fried Frank Harris Shriver & Jacobson LLP, New York, NY, for Appellant.

Eric L. Brossman, Robert J. Bein, Saul Ewing LLP, Dino A. Ross, Wolf Block Schorr & Solis–Cohen LLP, Victor P. Stabile, Dilworth Paxson, Anne K. Fiorenza, Office of the United States Trustee U.S. Attorney's Office, Harrisburg, PA, Matthew N. Kleiman, Kirkland & Ellis LLP, Larry J. Nyhan, Sidney, Austin, Brown & Wood, LLP, David S. Heller, Keith A. Simon, Latham & Watkins, Chicago, IL, Michael Luskin, Luskin, Stern & Eisler LLP, Lee S. Attanasio, Sidley, Austin, Brown & Wood, LLP, Peter V. Pantaleo, Simposon Thatcher & Bartlett LLP, New York, NY, for Appellees.

### MEMORANDUM AND ORDER

JONES, District Judge.

### THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Pending before the Court are the consolidated appeals by the Official Committee of Unsecured Creditors of New World Pasta Company ("Committee") of two final orders of the Bankruptcy Court; namely, the Debtor–in–Possession ("DIP") Appeal and the Cash Collateral Appeal.

For the reasons that follow, we will dispose of the consolidated appeals by remanding the matter in part to the Bankruptcy Court, and by denying the appeal in part.

### FACTUAL BACKGROUND:

As the factual details in the case *sub judice* are complex and have been extensively briefed by the parties, we will provide a brief summary for the purposes of this narrative. New World Pasta Company ("New World"), Pasta Acquisition Corp., The Prince Company, Inc., Ronzoni Foods International Corporation, and NWP Delaware, LLC (collectively, "the Affiliated Debtors"), the above-captioned debtors and debtors-in-possession (New World and the Affiliate Debtors collectively, "the Debtors") and their non-debtor subsidiaries and affiliates (collectively, "the Company") are leading manufacturers, marketers and distributers of dry pasta and noodles in the United States and Canada and also manufacture and market dry pasta in Italy. The Company produces a number of popular brands, many of which

are recognized leaders in their individual regions of the United States market, including but not limited to the following: Ronzoni, Creamette, Prince, Healthy Harvest, San Giorgio, Skinner, Light n' Fluffy, and Catelli. The Company is headquartered in Harrisburg, Pennsylvania, but has manufacturing plants in the United States, Canada, and Italy.

As part of the financing of the initial capitalization of the Company, on January 28, 1999, New World entered into a credit agreement ("the Credit Agreement") with the various institutions that were parties thereto as lenders ("Senior Secured Lenders"), the co-agents party thereto, Morgan Stanley Senior Funding, as syndication agent, and The Bank of Nova Scotia, as Administrative Assistant ("the Prepetition Agent"), pursuant to which the Senior Secured Lenders committed to lend New World an aggregate $250 million.

As of the Petition Date, New World was the borrower under the Credit Agreement. The obligations under the Credit Agreement were guaranteed by the Debtor Guarantors. Under the Credit Agreement, the Senior Secured Lenders and the Junior Secured Lenders (collectively, "the Prepetition Secured Lender") provided New World with loans and other financial accommodations including loans made in an aggregate amount of approximately $290 million, plus accrued fees, interest and charges ("the Prepetition Debt"). Under the Credit Agreement, the Debtors granted a security interest ("the Primed Liens") to the Prepetition Lenders in substantially all of the Debtors' assets and property ("the Prepetition Collateral").

### PROCEDURAL HISTORY:

On May 11, 2004 the Debtors each filed a voluntary petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101–1330. On the filing date, the Bankruptcy Court entered an order consolidating the Debtors' estates for procedural purposes only, and providing for joint administration of the Debtors' cases. The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code ("the Code"). On May 24, 2004, the United States Trustee for the Middle District of Pennsylvania appointed the Committee. No request has been made for the appointment of a trustee or examiner.

On the Petition Date, the Debtors filed a motion ("DIP Motion") seeking authority to obtain DIP financing pursuant to a postpetition credit agreement (the "DIP Credit Agreement") with a certain postpetition lender (the "Postpetition Lender"). The DIP Credit Agreement provides that any loans made to the Debtors thereunder shall be secured by liens that prime the Prepetition Senior Liens and the Prepetition Junior Liens under Bankruptcy Code § 364(d)(1) and be granted superpriority administrative expense status under Bankruptcy Code § 507(b). The Debtors also sought to use cash collateral of the Existing Lenders and to grant adequate protection to the Existing Lenders in connection with any diminution in value of the Existing Lenders' interest in the Prepetition Collateral.

On May 10, 2004, at the conclusion of the "first-day" hearing on May 10, 2004 (the "Interim Hearing"), the Bankruptcy Court entered an interim order ("Interim DIP Financing Order"), over the Committee's objection, which granted the Debtors interim relief on their motion ("DIP Financing Motion"). The Interim DIP Financing Order authorized (A) Secured Postpetition Financing on a Super Priority Basis pursuant to 11 U.S.C. § 364, (B) Use of Cash Collateral pursuant to 11 U.S.C. § 363 and (C) Grant of Adequate Protection pursuant to 11 U.S.C. §§ 363 and 364 and scheduled a final hearing pursuant to

Bankruptcy Rule 4001 for June 11, 2004. Under the terms of the Interim DIP Financing Order, the Debtors were provided with access to $20 million in DIP financing.

Additionally, on May 10, 2004, the Bankruptcy Court entered a stipulation ("Adequate Protection Stipulation") and agreed interim order (A) Authorizing the Use of Certain Lenders' Cash Collateral, (B) Granting Adequate Protection, and (C) Scheduling a Final Hearing for June 11, 2004. The Adequate Protection stipulation authorized the Debtors to use the purported Prepetition Junior Lenders' cash collateral on an interim basis and approved the granting of adequate protection to the entities.

On July 8–9 2004, the Bankruptcy Court held a final hearing with regard to the DIP Financing Motion and the Adequate Protection Stipulation (the "Hearing"). Following the Hearing, on July 13, 2004, the Bankruptcy Court overruled the Committee's objections and entered the Final DIP Order. On July 22, 2004, the Bankruptcy Court entered the Cash Collateral Order, authorizing the Debtors to use the purported Prepetition Junior Lenders' cash collateral.

On July 22, 2004, the Committee filed the Standing Motion for an order authorizing the Committee to commence an action on behalf of the Debtors' estates, asserting claims and causes of action against JLL Partners, Inc. and the Bank of Nova Scotia.

The Committee has appealed the following two orders of the Bankruptcy Court: (1) the Final Order authorizing (A) Secured Postpetition Financing on a Super Priority Basis pursuant to 11 U.S.C. § 364, (B) Use of Cash Collateral pursuant to 11 U.S.C. § 363 and (C) Grant of Adequate Protection pursuant to 11 U.S.C. §§ 363 and 364 entered by the Bankruptcy Court on July 13, 2004 (the "DIP Financ-

ing Order") and (2) the Final Order (A) Authorizing the Use of Certain Lenders' Cash Collateral and (B) Granting Adequate Protection pursuant to 11 U.S.C. § 361 and 363 entered by the Bankruptcy Court on July 22, 2004 (the "Cash Collateral Order").

On July 29, 2004 and thereafter by written stipulation dated September 8, 2004, the parties agreed to consolidate the appeals of both the DIP Financing Order and the Cash Collateral Order. By a September 9, 2004 Order, we consolidated the appeals under case number 04–cv–1873. (*See* Rec. Doc. 9).

This case has been briefed by the parties and on March 4, 2005, argument was heard in this matter. The matter is therefore ripe for disposition.

## *JURISDICTION:*

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 158(a)(1) and Fed. R.Bankr.P. 8001(a).

## *STANDARD OF REVIEW:*

 Federal Rule of Bankruptcy Procedure 8013, states in pertinent part that:

On an appeal the district court... may affirm, modify, or reverse, a bankruptcy judge's judgment, order, or decree, or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

Fed.R.Bankr.P. 8013. Moreover, the Third Circuit Court of Appeals has instructed that we review the Bankruptcy Court's legal determinations *de novo,* its factual findings for clear error, and its exercises of discretion for abuse. *In re Martin's Aquarium, Inc.,* 98 Fed.Appx. 911, 913 (3d Cir.2004); *see also In re Shar-*

*on Steel Corp.*, 871 F.2d 1217, 1222 (3d Cir.1989)("[I]t is settled law that this court applies a clearly erroneous standard to findings of fact, conducts plenary review of conclusions of law, and must break down mixed questions of law and fact, applying the appropriate standard to each component.") In so doing, we "accept the trial court's finding of historical or narrative facts unless clearly erroneous, but exercise 'plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir.1991)(*quoting Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101–02 (3d Cir.1981)).

### DISCUSSION:

The Committee presents the following two issues in this appeal:

1. Does the Bankruptcy Code permit an insider-owned and controlled debtor to limit the official committee of unsecured creditors' investigation and prosecution of prepetition insider transactions?

2. Does the Bankruptcy Code permit a debtor to cede control over the filing and content of its chapter 11 plan and disclosure statement to its postpetition lender by agreeing that the debtor may propose and file a plan of reorganization and disclosure statement only if it has been preapproved by such lender?

We will discuss the two issues presented for our review in turn.

1. The Committee stated in its brief that although the Investigation Cap and the Prosecution Bar contained in the Cash Collateral Order and the DIP Financing Agreement, and approved by the DIP Financing Order, pertain to the Prepetition Senior Lenders, in light

### A. INVESTIGATION CAP AND PROSECUTION BAR

■ Both the DIP Financing Order and the Cash Collateral Order, which we previously addressed, contain a $50,000 cap (the "Investigation Cap") on the Committee's use of proceeds from the DIP Financing Agreement (the "DIP Financing Proceeds") to investigate both the validity of the liens and the existence of claims against the Prepetition Senior Lenders and the alleged insider "purported" Prepetition Junior Lenders.[1] In addition, the DIP Financing Order and the Cash Collateral Order preclude the Committee from using any of the DIP Financing Proceeds, or any of the alleged insider "purported" Prepetition Junior Lenders' cash collateral, to prosecute claims against the alleged insider "purported" Prepetition Junior Lender (the "Prosecution Bar").

In this appeal, the Committee first argues that as a matter of law, the Investigation Cap and the Prosecution Bar in the DIP Financing Agreement, DIP Financing Order, and Cash Collateral Order concerning actions against JLL Partners, Inc. ("JLL")/Bank of Nova Scotia ("BNS") with respect to the alleged insider Prepetition Junior Loans are unlawful. (*See* Committee Reply Br. at 14–15). In support thereof, the Committee asserts that the Debtors are dominated by JLL, an 88% shareholder who also designated 100% of New World's board of directors (the "Board"). The Committee contends that prior to filling for bankruptcy, the JLL-controlled Board caused New World to (1) engage in a number of self-dealing transactions with JLL and (2) wrongfully treat JLL capital contributions as secured loans to the detri-

of the circumstances of the Chapter 11 cases, this appeal will be limited to the impropriety of such caps with regard to the Debtors' purported Prepetition Junior Lenders. (*See* Rec. Doc. 10 at 2–3, n. 3).

ment of all of New World's unsecured creditors. (*See* Committee Br. at 3–4). The Committee asserts that JLL used its control of the Debtors to negotiate with itself the terms of a Cash Collateral Order that prevents the Committee from investigating and prosecuting causes of action against it. *Id.* at 4.

We preliminarily note that as we previously mentioned and as was addressed at argument before the Court on March 4, 2005, the Committee filed a Standing Motion on July 22, 2004, for an order authorizing the Committee to commence an action on behalf of the Debtors' estates, asserting claims and causes of action against JLL and BNS. We anticipate that a decision from the Bankruptcy Court regarding the Committee's Standing Motion will be imminent. When argument was held before this Court, all parties conceded that if the standing decision by the Bankruptcy Court will be adverse to the Committee, then the Investigation Cap and Prosecution Bar issues now placed before us by the Committee will accordingly be mooted. However, there of course remains the possibility that the Bankruptcy Court will grant the Standing Motion filed by the Committee.

In the interest of judicial economy, we believe it most appropriate to remand this issue to the Bankruptcy Court. In the event that the Bankruptcy Court grants the Committee's July 22, 2004 Standing Motion, it is clearly within the power and sound discretion of the learned bankruptcy judge to make the threshold determination concerning whether circumstances necessitate revisiting her prior finding concerning the Investigation Cap in this matter. As we are confident that Judge France will do

so, we will place this matter back in her capable hands, and thus decline to decide the Committee's appeal with respect to the Investigation Cap and the Prosecution Bar at this juncture.

### B. THE ALLEGED LOCK–UP IN THE DIP FINANCING AGREEMENT

The second issue on appeal is that the Committee argues that the DIP Financing Agreement contains an unlawful provision, Section 5.13, whereby the Debtors may only propose a plan of reorganization and disclosure statement that have been pre-approved by the Prepetition Senior Lenders.[2] (*See* Committee Br. at 6). "The Lock–Up violates various provisions of the Bankruptcy Code by giving the Prepetition Senior Lenders control over the Debtors' chapter 11 process, thereby preventing the Debtors from carrying out their fiduciary duties. Moreover, the Lock–Up is not only contrary to applicable law, but its presence exceeds the acceptable limitations on provisions which may be included in a postpetition financing agreement." *Id.*

To be more specific, the Committee puts forth the following arguments in support of its assertion that the Lock–Up in the DIP Financing Agreement violates applicable bankruptcy law and should be removed. First, the Lock–Up restricts the Debtors' rights with regard to the filing of its plan of reorganization under § 1121, by effectively abandoning the Debtors' right to ever file a plan or reorganization without the Prepetition Senior Lenders' consent. (Committee Reply Br. at 27). "Second, the Lock–Up attempts to circumvent section 1129(b) by preventing the Prepeti-

---

**2.** Notably, as divulged by Black Diamond's counsel and not contradicted by any other counsel at argument before the Court, Black Diamond is both the DIP Lender and a dominant Senior Secured Prepetition Lender.

tion Senior Lenders from being crammed down in the event they are impaired under a plan of reorganization." *Id.* "Third, the Lock–Up violates section 1126(f), (which prohibits any unimpaired class of creditors from voting on a plan) by purporting to grant the Prepetition Senior Lenders not only the right to vote on a plan in the event they are unimpaired, but also the right to restrict the Debtors' ability to file such a plan with the Bankruptcy. Court." *Id.* Finally, the Committee asserts that postpetition financing arrangements may not include Lock–Up provisions. *Id.*

In response, New World asserts that Section 5.13 is reasonable and consistent with the Code. New World first argues that Section 5.13 does not contain a "Lock–Up" as it does not impose any obligation on any party to vote for or against any plan of reorganization. (New World Br. at 45–47). Second, New World maintains that Section 5.13 is consistent with the Code and points out that the Committee's objection to Section 5.13 ignores the uncontroverted evidence that Black Diamond refused to lend without the presence of the section at issue. *Id.* at 47–54.

For the reasons that follow, we do not find that the Bankruptcy Court committed an error of law in permitting the inclusion of Section 5.13 in the DIP Financing Agreement.

We preliminarily note that the portion of the DIP Financing Agreement at issue, Section 5.13, states, in pertinent part, that:

> The Credit Parties shall file a plan of reorganization and disclosure statement prior to March 31, 2005 which is acceptable to (a) Prior Lenders who then hold at least two-thirds of the amount of the Prior Senior Obligations and (b) more than one-half of the number of Prior Lenders who then hold Prior Senior Obligations[.]

Moreover, it is important to initially note that BNY/BD cites to cases in which courts have approved provisions in postpetition credit agreements that included an event of default if the debtor filed a plan without the approval of its DIP Lenders.[3] (BNY/BD Br. at 46–47). At argument before the Court on March 4, 2005, counsel for the Committee conceded that "this kind of provision," referring to Section 5.13, can be acceptable when the party who has been provided with the control is the DIP lender; however, the Committee asserted that the applicable caselaw does not suggest that a prepetition senior lender can be provided with a comparable amount of control. (Oral Arg. of 3/4/05 at 9–10). Counsel for the Committee agreed

---

**3.** *See e.g. In re Fleming Companies, Inc.,* No. 03–10945(MFW)(Bankr.D.Del. May 6, 2003)(Court entered a final order approving a postpetition credit agreement which contained an event of default for the debtor's "failure to file a Plan acceptable to the Required Lenders within 360 days following the Filing Date."); *In re Fansteel Inc.,* No. 02–10109(JJF)(Bankr.D.Del. May 21, 2002)(court entered a final order approving a postpetition credit agreement which contained an event of default if "any Borrower files a chapter 11 plan that is not acceptable to Lender; provided, that any such plan that includes the repayment of the Obligations in full and the cash collateralization of any contingent Obligations...shall be deemed to be acceptable to the Lender"); *In re Farmland Indus., Inc.,* 294 B.R. 855, 860 (Bankr.W.D.Mo. 2003)(court stating that it had previously approved debtor's postpetition credit agreement that contained a termination event for "failure of [debtor] to file a plan or reorganization approved by all DIP Lenders (such approval not to be unreasonably withheld) by the date that is 180 days after the Petition Date (it being agreed, however, that it shall be reasonable for DIP Lenders to withhold approval of any plan that does not provide for the payment (or cash collateralization in the cash of Contingent Obligations) of all DIP Obligations and Prepetition Obligations in full in cash on the effective date thereof)").

with the Court that the caselaw does not explicitly prohibit providing this type of control, but rather, the Committee contended that it is prohibited by inference based upon the caselaw and applicable Bankruptcy Code rules. *Id.* at 10.

We will now first determine whether Section 5.13 constitutes a "lock-up" and second, whether Section 5.13 violates applicable provisions of the Bankruptcy Code.

### i. *Whether Section 5.13 Constitutes a "Lock–Up?"*

■ The Committee initially argues that Section 5.13 contains a "lock-up." We initially note that after a careful review of the record, we are in agreement with New World that Section 5.13 does not contain a "lock-up" for the reasons that follow.

First, in the context of pre-negotiated chapter 11 cases, lock-up agreements are negotiated by sophisticated parties and provide for a commitment to support a particular restructuring, subject to various terms and conditions. "Usually, lock-up agreements are agreed to and fully executed prior to filing the chapter 11 case, together with the terms of the proposed restructuring." Daniel J. DeFranceschi, *Delaware Bankruptcy Court Announces Bright–Line Rule For Use of Lock–Up Agreements in Chapter 11 Cases,* Am. Bankr.Inst. J., Feb. 16 2003. In this case, the parties did not consent to a lock-up agreement prior to filing the chapter 11 case.

■ Second, as New World submits, a "lock-up" refers to an agreement between a creditor and a debtor (or prospective debtor) in which the creditor becomes legally bound to vote for a plan of reorganization so long as certain key plan provisions are included. Parties enter into lock-up agreements to "bind each other to a deal, even when the underlying restructuring documents remain to be drafted and executed. Typical operative language in a lock-up agreement provides that a significant stakeholder agrees to support a restructuring plan subject to various terms and conditions." *Id.* If the creditor did not ultimately vote for the plan, the creditor is deemed to breach the lock-up agreement and becomes subject to specific performance remedies and injunctive relief. *Id.* When courts have struck down lock-up provisions, they have done so on the ground that votes to accept a reorganization plan cast by a party that signed a lock-up agreement post-petition and prior to the publication of a court-approved disclosure statement may not be counted. *Id.*

The Committee cites to *In re Stations Holding Co. Inc.,* 2004 WL 1857116, 2004 Bankr.LEXIS 1220 (Bankr.D.Del. Aug. 18, 2004) and *In re NII Holdings, Inc.,* 288 B.R. 356 (Bankr.D.Del.2002) in support of its assertion that Section 5.13, which as noted is alleged by the Committee to be a lock-up agreement, is not permissible under the Bankruptcy Code. We are in agreement with New World and BNY/BD that the above-referenced cases are distinguishable in that the challenged lock-up agreements bound the creditor signatories to vote for the debtor's plan of reorganization. More specifically, in separate, unreported rulings, in the *In re Stations Holding, Inc.* and *In re NII Holdings, Inc.* cases, the United States Bankruptcy Court for the District of Delaware held that votes to accept a reorganization plan cast by a creditor or interest-holder that signed a lock-up agreement after the petition date and prior to approval and circulation of a disclosure statement would be "designated" under § 1126 of the Code, and thus would not be counted for purposes of determining· acceptance or rejection of the plan. Unlike those cases, Section 5.13 contains no such restriction on how any creditor must vote. Notably, section 5.13 does

not contain a restriction on any party mandating it to vote for or against any plan of reorganization. We are in agreement with New World that although Section 5.13 does provide that if a certain percentage of Senior Secured Prepetition Lenders find a plan proposed by the Debtors to be unacceptable, they can seek to terminate the Amended Credit Agreement, Section 5.13 does not bind any creditor to vote for a plan. Accordingly, we do not find that Section 5.13 constitutes a "lock-up.[4]"

### ii. *Whether Section 5.13 Violates the Bankruptcy Code?*

The Committee then argues that even if it is not an actual "lock-up," Section 5.13 violates sections 1121, 1129(b), and 1126(f) of the Code. For the reasons that follow, we find Section 5.13 to be consistent with the Code.

4. Even though we have determined that Section 5.13 does not constitute a "lock-up," we do note that the cases the Committee cites to in support of its assertion that postpetition financing arrangements may not include lock-up provisions are distinguishable from this case. (*See* Committee Reply Br. at 27–28). The Committee is analogizing Section 5.13 to lock-up voting arrangements, cross-collateralization clauses, and roll-ups, all of which are allegedly disfavored under bankruptcy law. These analogies have little relevance to the instant case.

 First, lock-up agreements contractually require parties to vote in favor of a proposed plan, *In re Stations Holding Co., Inc.,* 2004 WL 1857116, 2004 Bankr.LEXIS 1220 (Bankr.D.Del.2004), whereas in this case the Debtors are not forced to file any type of plan of reorganization, and are not bound to accept any plan of reorganization proposed by the Prepetition Senior Lenders. Second, cross-collateralization is where a lender seeks to use postpetition assets to secure prepetition loans, whereas a roll-up is where prepetition claims are transformed into postpetition, administrative expenses. *See In re Saybrook Mfg. Co., Inc.,* 963 F.2d 1490, 1491 (11th Cir.1992). We agree with BNY/BD that both

◼ First, the Committee asserts that Section 5.13 restricts the Debtors' rights with regard to the filing of its plan of reorganization under section 1121, by effectively (1) granting the Prepetition Senior Lenders the Debtors' exclusivity rights, and (2) abandoning the Debtor's right to ever file a plan of reorganization without the Prepetition Senior Lenders' consent. (*See* Committee Br. at 35).

Section 1121(a) provides that, "The debtor may file a plan with a petition commencing a voluntary case, or any time in a voluntary case or an involuntary case." In addition, section 1121(b) grants a DIP an exclusive right to file a plan of reorganization within the first 120 days of its chapter 11 case. 11 U.S.C. § 1121(b). Inasmuch as the Debtors' exclusivity period expired on September 7, 2004, we find the Committee's exclusivity argument to be moot.[5]

clauses have the effect of improving the priority of a prepetition creditor, either through securing previously unsecured claims or paying previously unsecured claims, whereas Section 5.13 has absolutely no effect on the prepetition claims or collateral of the Prepetition Senior Lenders. It only addresses on what terms they will provide new funds or allow the use of their cash collateral in these chapter 11 cases.

5. Additionally, the cases cited by the Committee are factually distinguishable from this case. In *In re Situation Management Systems, Inc.,* 252 B.R. 859 (Bankr.D.Mass.2000), the court found that as a practical matter the debtor's exclusive right to propose and gain acceptance of a plan had effectively been forfeited because any party could bid on the debtor's equity interest and assume control of the debtor if the bidder was successful. After the largest creditor intended to bid, there was cause to terminate the debtor's exclusivity period to gain acceptance of its plan.

 In this case however, Section 5.13 does not grant the Senior Secured Prepetition Lenders or any other creditor the right to propose or take any other equivalent action, such as purchasing the Debtors' equity.

Second, the Committee asserts that Section 5.13 violates section 1129(b) of the Code, which provides that an impaired class may be "crammed down" if the debtor can demonstrate that its plan "does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). In *In re Tenney Village Company, Inc.*, 104 B.R. 562 (Bankr. D.N.H.1989), the primary case relied upon by the Committee in connection with its section 1129(b) argument, the court denied the debtor's motion for approval of a financing agreement, which included a prioritized security interest to the creditor. It limited the creditor's security interest to the amount of an interim loan and subordinated its rights to those previously perfected interests of the other lienholders. In *Tenney Village*, the clause at issue prohibited the debtor from seeking to confirm a plan over the lender's objection. We are in agreement with New World that Section 5.13 does not prevent the Debtors from confirming a plan over the objections of any lender, but rather entitles Black Diamond to cease funding the Debtors in the event of a cram-down. (New World Br. at 50–51). In addition, we find that *Tenney Village* is factually distinguishable from this case. Within the credit agreement in *Tenney Village*, the debtor agreed to cede all control over its daily business operations and the conduct of its chapter 11 case to the lender. "The Financing Agreement, which runs to 47 pages, would give the Bank numerous rights concerning the Debtor's operations and the Chapter 11 reorganization." *In re Tenney Village*, 104 B.R. at 567. Consider, for example, that the proposed credit agreement in *Tenney Village* entitled the lender to directly supervise all of the debtor's operations, approve the debtor's CEO, accelerate the loan if the debtor fired the CEO

without the lender's consent, approve the debtor's business plan, and even set the prices the debtor could charge for its products. *Id.* Accordingly, the court in *Tenney Village* reviewed the "cram down" prohibition at issue in the context of an agreement that contained numerous other far-reaching restrictions on the debtor's ability to operation its business.

We therefore find the *Tenney Village* case to be factually distinguishable from the instant case, and additionally find that while Section 5.13 allows the Senior Secured Prepetition Lenders to terminate funding if the Debtors propose a plan that is not "acceptable" to the them, it does not preclude the Debtors from cramming down the Senior Secured Prepetition Lenders in the event that they are impaired under the Debtors' proposed plan and the Debtors deem a cram-down appropriate. Section 5.13 consequently does not violate section 1129(b) of the Code.

Third, the Committee argues that even in the event that the Prepetition Senior Lenders are unimpaired, application of Section 5.13 still results in a violation of section 1126(f) of the Code. (Committee Br. at 41–42).

Section 1126(f) states that, "[A] class that is not impaired under a plan, and each holder of claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required." 11 U.S.C. § 1126(f). Without citing to a single case in support thereof, the Committee contends that Section 5.13 somehow grants the Senior Secured Prepetition Lenders the right to vote on a plan regardless of whether they are impaired. We are in agreement with New World that as we previously discussed, Section 5.13 does not, in any way, implicate

the right or ability of the Senior Secured Prepetition Lenders to vote. Section 5.13 provides that if a certain percentage of the Senior Secured Prepetition Lenders do not approve the plan, then they can seek to terminate the Amended Credit Agreement. Accordingly, Section 5.13 does not violate section 1126(f) of the Code.

■ Lastly, the Committee argues that Section 5.13 prevents the Debtors from carrying out their fiduciary duties. (Committee Br. at 42–44). The Committee submits that one of the duties that a debtor has to its creditors is to control its reorganization process in a way that does not discriminate unfairly against any creditor, while at the same time, maximizing value. "As part of such duties, debtors control the formation of the plan of reorganization. Debtors thus have the obligation to their creditors to propose a plan that is fair to all creditors and not to let one creditor class dominate the formation of the plan." *Id.* at 42–43.

After carefully reviewing the record in this case, we find the Committee's contention that Section 5.13 prevents the Debtors from carrying out their fiduciary duties to be meritless. We are in agreement with New World that while Section 5.13 reasonably assumes that a plan proposed by the Debtors will be the product of negotiations and consensus between the Debtors and their major creditor groups, including the Senior Secured Prepetition Lenders, Section 5.13 does not, unlike the provisions in *Tenney Village*, require the Debtors to cede any control over their operations, the formulation of their plan, or the general management of their chapter 11 cases.

Our general view of this combined appeal is that the Committee is seeking to have us make mischief with regard to a highly material provision in an agreement negotiated for the purpose of keeping a considerable business enterprise funded and operating. The Prepetition Senior Lenders entered into a consensual arrangement with the Debtors based upon the specific terms, conditions, and covenants contained in the Postpetition Credit Agreement and Final Order. As Black Diamond explained in its submission to the Court and during argument, one of the terms that was critical to the consent of the Prepetition Senior Lenders and negotiated protection package was Section 5.13 of the Postpetition Credit Agreement. (*See* BNY/BD Br. at 37). Moreover, Black Diamond not only insisted upon the provision at issue, but relied upon it as it extended millions of dollars to New World since the Bankruptcy Court's approval of the Postpetition Credit Agreement. While clauses of this type are certainly subject to review by the Bankruptcy Court and this Court, the Committee is, in effect, asking us to write out of the negotiated agreement a highly material term, which could place at risk the considerable sum of money that Black Diamond has already advanced to New World. The argument interposed by the Committee that Black Diamond assumed that risk and could as a result of the deletion of the onerous section decline to make subsequent advances, or proceed to do so under greater risk, is unavailing. We thus decline to take the drastic and unwarranted measure suggested by the Committee, and will allow Section 5.13 to stand unmolested by judicial fiat.

We therefore do not find that the Bankruptcy Court committed an error of law in permitting the inclusion of Section 5.13 in the DIP Financing Agreement. Finally, as counsel for the Committee conceded at argument before the Court on March 4, 2005 that if we resolve the question of law against the Committee there would be no need to delve into the use of the Bankrupt-

cy Judge's discretion, we need not protract this analysis by doing so.

**NOW, THEREFORE, IT IS OR-DERED THAT:**

1. The Committee's appeal (doc. 1) is remanded in part and denied in part.

 A. The Committee's appeal is re-manded to the extent that in the interest of judicial economy, if the Bankruptcy Court grants the Committee's July 22, 2004 Standing Motion, it is within the power and sound discretion of the learned bankruptcy judge to make the threshold determination if the circumstances necessitate revisiting her prior finding concerning the Investigation Cap.

 B. The Committee's appeal is denied to the extent that the Bankruptcy Court did not commit an error of law in permitting the inclusion of Section 5.13 in the DIP Financing Agreement.

2. The Clerk is directed to close the file on this case.